476 A.2d 1175

**Miyoko MOUNT**

v.

**Edward L. MOUNT.**

**No. 1194, Sept. Term, 1983.**

Court of Special Appeals of Maryland.

July 11, 1984.

J. Seymour Sureff, Baltimore, for appellant.

Douglas Clark Hollmann, Annapolis, with whom were P. Tyson Bennett and Goodman, Cohen & Bennett, P.A., Annapolis, on the brief, for appellee.

Argued before WILNER, WEANT and BISHOP, JJ.

BISHOP, Judge.

Miyoko Mount appeals from a decree of the Circuit Court for Anne Arundel County which granted to Edward L. Mount, appellee, a divorce *a vinculo matrimonii* on the ground of voluntary separation. The decree also equally

divided marital property valued at $106,000, decreased appellant's share of the marital property by granting appellee a monetary award of $6,000, awarded appellant monthly alimony of $200 for a period of nine months and counsel fee of $4,500, and divided certain personal property between the parties.

## *Facts*

This second marriage for each party occurred on January 10, 1974. They separated in September 1980. Appellant claims the separation was caused by hostile and violent acts of appellee and his actual desertion; appellee claims that the separation was by mutual consent. Appellant, about 48 years of age, was born in Saseba, Japan. She was trained in a dress maker college and worked as a tailor. She also had operated an unsuccessful restaurant. Appellee, 53 years of age, operated a bowling alley in which he had a 10% interest, acquired before his marriage to appellant.

The record supports appellant's contention that over the years appellee had beaten her a number of times and that, as a result, she was hospitalized four or five times.

On April 1, 1979, two men appellant identified as acquaintances of her husband assaulted and robbed her after, she claimed, she had been set up by her husband. To support appellee's complicity appellant argues that certain items, including an album of photographs, which had been in her stolen purse, surfaced later in the possession of her husband.

Three months later, on July 11, 1979, the building in which appellant owned and operated a restaurant was destroyed by fire. To settle a law suit based on her failure to pay a loan made for the purchase of the restaurant, appellant paid $22,322.50 from the proceeds she received as her share from the sale price of the family residence.

As a result of the assault and robbery appellant's physician found that she had "post traumatic headache syndromes in which trauma to the brain has caused intractable

and at times frequent headaches and severe anxiety;" and that "she complained of chronic right shoulder and neck pain with limited motion." On March 2, 1981, almost two years later, the physician found that she was 100% disabled and would remain so until April 1, 1982. As a result of this incident, the Workmen's Compensation Commission, on September 2, 1981, found that appellant had sustained an 18% industrial loss of the use of her body (neck—8% and head 10%) for which she received a permanent partial compensation award of $6,660.00, payable at the weekly rate of $74.00, beginning on April 14, 1980.

Psychiatrist Michael D. Potash, on April 23, 1981, reported that appellant had a 5% psychiatric disability as a result of the assault and robbery incident, plus a pre-existing psychiatric disability of 15% "as a result of grave marital discord." He also reported that appellant suffered a long series of traumatic events beginning when she was an early adolescent with the bombing of Nagasaki.

Appellee had a gross salary of $505.00 per week, plus a $30.00 monthly expense account. He received money from land he owned in Pennsylvania. Also, he owned a dwelling in which he allowed a friend to live rent free.

On August 22, 1974, a dividend of fifteen shares of the stock of Greenway Bowl East, Inc., was declared on the ninety shares of Greenway Bowl, Inc., stock which appellee had acquired before his marriage. The chancellor found that none of this stock was marital property because the Greenway Bowl, Inc., stock was acquired before the marriage, and the Greenway Bowl East, Inc., stock was a stock split resulting from that prior stock acquisition. Greenway Bowl, Inc., had a net worth of $1,439,263.00 and Greenway Bowl East, Inc., a net worth of $1,071,999.00.

Appellee testified that he had a $60,000.00 life insurance policy on which he had paid monthly premiums of $52.00 for 10 or 12 years and in which appellant had been named beneficiary. Prior to trial appellee had changed the benefi-

ciary designation to his two children. The record does not indicate the cash value of the policy.

In addition to a $3,000.00 Individual Retirement Account, appellee had a $20,000.00 insurance policy designated as a retirement fund. Since 1964 he had been paying weekly premiums of $11.00. In 1984, the 20th anniversary of the policy, appellee would be entitled to receive the $20,000.00.

As a result of her restaurant business failure, except for alimony and $500.00 in cash, a 1978 Dodge and a $200.00 life insurance policy, appellant was without funds. She was living in a boarding house at a monthly cost of $400.00. Her financial statement showed total monthly expenses of $560.22.

Additional facts will be supplied during the discussion of the issues.

Appellant raises seven issues contending that the court erred:

1. In its determination that the parties mutually separated.

2. In its refusal to grant the appellant a divorce *a vinculo matrimonii* on the grounds of abandonment.

3. In awarding the appellant alimony for nine months rather than permanent alimony.

4. In failing to consider the husband's ownership in Greenway Bowl, Inc., and Greenway Bowl East, Inc., in determining alimony and marital award.

5. In determining that 6 Ivy Lane, Country Club Estates was marital property.

6. In failing to determine that Mrs. Mount was entitled to contribution for furnace repairs made while she lived at the marital home and after appellee had moved out.

7. In failing to determine what interest Mrs. Mount had in her husband's $20,000.00 retirement policy and the $60,000.00 life insurance policy.

### The Divorce

■ After finding that a voluntary separation occurred in November 1981, the chancellor granted appellee's amended and supplemental bill of complaint for a divorce based on mutual and voluntary separation for more than a year. Maryland Annotated Code, Article 16, section 24. Appellant argues that appellee returned to the home, slept there and attempted to have sexual relations with her during the crucial twelve month period. Appellee denied this, stating that when he visited the home appellant was not present.

Citing *Carney v. Carney*, 16 Md.App. 243, 295 A.2d 792 (1972) and *Lillis v. Lillis*, 235 Md. 490, 201 A.2d 794 (1964) for her authority, appellant contends that "parties cannot live under the same roof in a voluntary separation." We agree; however, in this case there was an evidentiary conflict, which the chancellor resolved in favor of appellee.

Appellant also argues that there was no corroboration of the mutual and voluntary separation. Again there was conflicting testimony on this issue, although it appears that in September 1981 appellant did admit that she told appellee that she did not want to remain married to him. In her answer to appellee's bill of complaint, which she later amended to the contrary, appellant admitted to the mutual and voluntary separation. Appellant further claims that the testimony of appellee's two witnesses on this issue was not sufficient to provide even the slight corroboration required. *Fedder v. Fedder*, 248 Md. 162, 235 A.2d 553 (1967) and *Sewell v. Sewell*, 218 Md. 63, 145 A.2d 422 (1958). The chancellor resolved the evidentiary conflicts in favor of the appellee.

Appellant concludes that in both *Misner v. Misner*, 211 Md. 398, 127 A.2d 547 (1956) and in the case sub judice "there was no evidence that the parties ever met or discussed their marital relationship after the original separation." In *Misner* the appellant's wife flatly contradicted appellee husband on the evidence pertaining to the mutual and voluntary issue. We do not read *Misner* to mean that

an involuntary or forced separation never can ripen into a mutual and voluntary separation unless the parties meet and discuss the issue.

The chancellor resolved these factual conflicts in favor of the appellee and since he was not clearly erroneous, we must affirm his action. Maryland Rule 1086.

Even if the original separation had been caused by the wrongful conduct of appellee, in view of our holding above, it would not be relevant to this issue.

## The Ivy Lane Property

■ Appellant argues that the Ivy Lane real property, which was titled in her name prior to the marriage, and which she brought into the marriage with her, was transferred into their joint names during the marriage solely for the purpose of obtaining a loan and, therefore, was not a gift to the appellee. We will not look beyond the deed to the Ivy Lane property. Each party came into the marriage with previously owned real property; each placed each other's respective name on the deeds and thereby made valid gifts to each other. *Bledsoe v. Bledsoe*, 294 Md. 183, 186–87, 448 A.2d 353 (1982). We affirm the chancellor's determination that Ivy Lane is marital property.

## The Stock

■ Appellant concedes that the appellee's 90 shares of Greenway-Bowl stock acquired before the marriage is not marital property, but argues that the 15 shares of Greenway-Bowl East stock received during the marriage should be considered marital property.

In his written opinion the chancellor found that, "The stock in Greenway-Bowl East is a stock split ... it is attributable directly to the Greenway-Bowl, Inc., stock and is likewise not marital property." The evidence does not support the chancellor's conclusion that the Greenway-Bowl East stock resulted from a stock split. It is clear that

Greenway-Bowl East stock was issued as a dividend to the Greenway-Bowl stockholders.

In Exhibit No. 20, a letter from Greenway-Bowl, Inc., and dated November 17, 1982, signed by James T. Russell, Secretary-Treasurer, the following appears:

"Edward Mount received 15 shares of Greenway Bowl East, Inc., stock that transacted (sic) by a transfer of ownership from Greenway Bowl, Inc., on August 22, 1974."

On December 28, 1982, during cross-examination, appellee was asked about the Greenway Bowl East, Inc., stock certificate:

"Q. Was that a stock dividend that was given to you, sir?

A. From the Greenway Bowl, Inc., (sic) owns stock ... owns stock in Greenway Bowl East ... for tax purposes they took, gave us stock in there instead of giving us dividends anymore, they gave us stock into there but it was from Greenway Bowl, Inc's (sic) stock."

There are important differences between a stock split, and a dividend paid in the stock of another corporation. A stock split, says Fletcher, *Cyclopedia Corporations* § 5362.1:

"[I]s merely a dividing up of the outstanding shares of a corporation into a greater number of units without disturbing the stockholder's original proportional participating interest in the corporation. His proportionate share of ownership, his rights on dissolution and the total value of his investment in the corporation are all preserved intact after the split is consummated. The only noteworthy occurrences resulting from a stock split are the receipt of a new certificate evidencing the change in shares and the necessary clerical corrections to be made on the record books."

A stock split does not generally alter the amount of the corporation's capital. That, in essence, is what distinguishes it from a stock dividend. *Geier v. Merc. Safe Dept.*

& Tr. Co., 273 Md. 102, 119–20, 328 A.2d 311 (1974); Fletcher, *supra*, § 418–14; Md.Code, Corp. & Assoc. art. § 2–309(e)(1). Clearly, the Greenway Bowl East stock was not acquired through any stock split.

A cash dividend, or a dividend paid in the form of some other corporate property (such as stock in another corporation) has a far different significance. Again, as Fletcher points out, § 5355:

> "Such a dividend diminishes the property of the corporation by exactly the amount paid out and correspondingly increases the property of the individual stockholders, or, in other words, subtracts so much from the treasury of the corporation and transfers it to the pockets of the stockholders."

Assuming that the distribution of the fifteen shares was a proportional one based on Mr. Mount's ownership of the 90 shares of Greenway Bowl, Inc., (*i.e.*, one share of Greenway Bowl East stock for each six shares of Greenway Bowl, Inc., stock owned), and that all other stockholders of Greenway Bowl, Inc., received the same proportional distribution, it would appear that the Greenway Bowl East stock was not acquired as a true stock dividend, but as an ordinary dividend paid in property other than cash. *See* Corp. & Assoc. art. § 2–309(a).

If this is what occurred—and that is all that the record indicates—the transaction was simply the transfer of a corporate asset to the stockholders. The value of Mr. Mount's stock in Greenway Bowl, Inc. declined because the corporate net worth diminished, but, again assuming a proportional distribution, his own personal wealth remained the same. The decline in the value of his Greenway Bowl, Inc., stock was fully compensated by the addition of the Greenway Bowl East stock.

Md.Cts. & Jud.Proc.Code Ann., section 3–6A–01(e) defines marital property as

" . . . all property however titled, acquired by either or both spouses during their marriage. *It does not include property acquired prior to the marriage,* property acquired by inheritance or gift from a third party, or property excluded by valid agreement *or property directly traceable to any of these sources.*" (Emphasis supplied.)

The cardinal principle of statutory construction is to determine the intent of the legislature. If the language of the statute is clear and unambiguous, then the legislative intent is determined by giving that language its normal and customary meaning. The basic rule has always been to look first to the language of the statute and to look elsewhere *only* if that language is unclear and ambiguous. *Ryder Truck Lines v. Kennedy,* 296 Md. 528, 535–6, 463 A.2d 850 (1983) and the cases cited therein. If no ambiguity or obscurity is found in the statutory language, there is no need to look elsewhere for the legislative intent. *Utt v. State,* 293 Md. 271, 287, 443 A.2d 582 (1982); *Vallario v. State Roads Comm'n,* 290 Md. 2, 6–7, 426 A.2d 1384 (1981); *Slate v. Zitomer,* 275 Md. 534, 539, 341 A.2d 789 (1975).

It is only when functioning in the domain of ambiguity and uncertainty that courts resort to "extrinsic aids such as examining the history of the passage of the law, the reports of committees and commissions, the introduction of amendments and testimony given before legislative committees". *Bledsoe v. Bledsoe,* 294 Md. 183, 448 A.2d 353 (1982). Certainly, the marital property law has a fairly well documented legislative history (Report Accompanying the Commission's Proposed Bill On The Disposition Of Property In Connection With Divorce And Annulment (1978)); however, because of the clear and unambiguous exclusionary language used by the legislature in excepting certain property from the definition of marital property, we are prohibited from looking to these extrinsic aids. We must not and should not in the face of unambiguous statutory language

look elsewhere to create an ambiguity where one does not exist. That would be putting the cart before the horse.[1]

In this case there is no question "what property directly traceable" to "property acquired prior to the marriage" means.[2] The key word "traceable" means "that may be traced" and "that may be attributed; due; ascribable; with *to;* as, a failure traceable to lack of energy." Webster's International Dictionary, 2nd ed., Unabridged, 1942, page 2681. Also, "traceable" is defined as "capable of being traced". Webster's Third International Dictionary, Unabridged, 16 ed. (1971) page 2420.

■ "[P]roperty acquired prior to the marriage" or "directly traceable to" such property is not marital property under the Maryland statute. The Greenway Bowl, Inc., stock was "acquired prior to the marriage" and upon the record before us, we conclude that the Greenway Bowl East stock was "directly traceable" to the Greenway Bowl, Inc., stock, and thus partook the non-marital character of that stock. It does not appear from this record that either Mr. or Mrs. Mount contributed in any way to the acquisition of the Greenway Bowl stock, either when acquired by Greenway Bowl, Inc., or by Mr. Mount.

Based on the foregoing we hold that the fifteen shares of Greenway Bowl East, Inc., stock is directly traceable to the ninety shares of Greenway Bowl, Inc., stock owned by the appellee prior to the marriage and, therefore, is not marital property.

It is important to understand that our holding in this case is a limited one. Property can produce other property in many different ways. In some instances, it may require active intervention and management by the owner or some assistance by the owner's spouse; in other instances, non-marital property can accrete or produce income without any

---

**1.** John Haywood's Proverbs (1546).

**2.** Nevertheless, after researching the legislative history of the statute, we found nothing to indicate that the legislature intended the words of the statute to have anything but their plain meaning.

effort at all on the part of the owner or the owner's spouse. In either case, all, some, or none of the income or accretion generated by or from the initial property may be used for family purposes. When one superimposes upon these variables the further varieties in type of income or accretion that can flow from property, the difficulty in fashioning any kind of reliable litmus test for judging whether and when the new property partakes the non-marital character of its prognitor becomes evident.

## Life Insurance and Retirement

■ Appellant argues that the chancellor erred in failing to include as marital property either the value of appellee's life insurance/retirement policy in the face amount of $20,-000.00, or the value of his $60,000.00 life insurance policy.

Both of these policies should have been included in the evaluation of the marital property. The life insurance retirement fund was initiated in 1964. The parties were married in 1974 and divorced in 1983. Since appellant made weekly payments of $11.00 on this policy from 1974 to 1983, it is clear that part of the value was acquired during the marriage. Applying the source of funds theory, *Harper v. Harper*, 294 Md. 54, 448 A.2d 916 (1982); *Gravenstine v. Gravenstine*, 58 Md.App. 158, 472 A.2d 1001 (1984), that part of the value of the life insurance retirement fund acquired during the marriage should have been included as marital property. Although the status of the $60,000.00 life insurance policy is not as clear, there is sufficient evidence in the record to indicate that some premiums were paid after the marriage and to the extent that they were, the value so established should be included as marital property.

It will be necessary for the chancellor to determine what the ratio is between the amounts of premiums paid on these policies during the term of the marriage against the amounts paid before the marriage, and the relation of this to the cash values of the policies at the time of the divorce. *Harper, supra.*

*Contributions for Repairs to the Marital Home*

Apparently for the installation or change-over of the furnace in the marital home, appellant paid something in excess of $600.00, to which appellee had allegedly agreed to contribute 50%. Although there is testimony in the record extract supporting this payment, the documentation, a letter dated either December 18 or January 12, and designated Exhibit L, is not included. From the record it does not appear that the chancellor made any disposition of this issue. We will remand for further proceedings so that the trial court may make an explicit finding. Maryland Rule 1071.

*Alimony*

Appellant argues that the chancellor awarded her monthly alimony of $200.00 for nine months beginning March 1, 1983, and stated no reason for the award.

For the purposes of the monetary award the chancellor, in his written opinion, considered each of the nine required factors set out in Maryland Courts and Judicial Proceedings Article, section 3–6A–05, he stated:

"Applying all the factors, we feel that the husband would be entitled, normally to a substantially higher share of the property because of his greater original investment. However, most of the other substantial factors all are in favor of the wife. Rather than award her alimony for any long period, we feel that approximately an equal share of the property ought to go to her. Valuing everything at $106,000.00, we will award him a $6,000.00 marital award. This means he will receive $59,000.00 and she will receive $47,000.00 of the marital property. We also award her alimony of $200.00 per month for the next nine months beginning March 1, 1983."

Specifically, in considering marital property factor "(7) how and when specific marital property was acquired, etc.," the chancellor observed:

"This is the greatest plus for the husband. He obviously owned, originally, the property which has a greater equity by a margin of almost three to one. Normally, this would entitle him to a substantially greater share."

Appellee argues that, after finding that appellee had made a greater original investment and would have been entitled to a substantially higher share of the marital property than appellant, the chancellor specifically granted to appellant a larger share of the marital property to off-set the short term alimony award.

■ Maryland Annotated Code, Article 16, § 1 requires that in awarding alimony the court consider all relevant factors, including eleven specific factors. The chancellor is not required to invoke expressly the wording of the statute to demonstrate that he considered the eleven factors. *Grant v. Zich*, 53 Md.App. 610, 618, 456 A.2d 75 *cert. granted* 296 Md. 110 (1983); *Cf. Jordan v. Jordan*, 50 Md.App. 437, 439 A.2d 26 (1982).

It is sufficient if we can determine from a reading of the entire record and the chancellor's opinion that he did consider these factors before making the alimony award. *Id.* at 443–44, 439 A.2d 26. In the course of determining the marital property award under section 3–6A–05(b) of the Courts article, the chancellor considered all but three of the alimony factors.

As to "(5) The duration of the marriage," the court found: "... The parties were married a sufficient time to develop substantial financial ties. In addition, we cannot totally discount their period of living together."

Alimony factor (6), "The contributions, monetary and nonmonetary, of each party to the well-being of the family;" was considered under section (1) of the marital property factors. The court stated: "This frequently applies when the wife does not work, but takes care of the children."

Alimony factor "(7) The facts and circumstances leading to the estrangement of the parties and the dissolution of the marriage;" was considered by the chancellor under mone-

tary award factor (4): "The circumstances and facts which contributed to the estrangement of the parties. We do not feel this important."

Under Article 16, § 1(b)(1), "financial needs and assets of both parties", the chancellor failed to consider the value of the insurance policies as marital property. This must have necessarily distorted his view of the financial needs and assets of the parties.

■ The chancellor did not make any explicit finding with reference to subsections:

"(2) The ability of the party seeking alimony to be wholly or partially self-supporting;

(3) The time deemed necessary by the court for the party seeking alimony to gain sufficient education or training to enable that party to find suitable employment;

(4) The standard of living of the parties established during the marriage; ...."

With reference to "(6) the contributions, monetary and nonmonetary, of each party to the well-being of the family;" also a factor under (1) of the 3–6A–05(b), the chancellor erroneously found that this applies "when the wife does not work but takes care of the children." Nonmonetary contributions include something in addition to "taking care of the children"—for example, the preparation of meals, doing laundry, providing a clean and wholesome house, etc.

Since it is a factor to be considered both in the award of alimony, section (7) and in the making of a monetary award, section (4), the chancellor erred as a matter of law when he found that "the facts and circumstances leading to the estrangement of the parties and the dissolution of the marriage" were not "important" in considering either the award of alimony or the monetary award. There is overwhelming evidence in the record that the appellee was primarily or solely responsible for the dissolution of this marriage.

We affirm that part of the decree whereby appellee was granted a divorce based on mutual and voluntary separation

for a period of twelve months. We reverse those parts of the decree by which the chancellor determined marital property, the amount of the monetary award and the award of alimony and we vacate those awards. We neither reverse, affirm nor modify on the issue of appellant's entitlement to partial reimbursement from the appellee for the maintenance item on the former family home but remand, in accordance with Maryland Rule 1071, for explicit disposition thereof.

JUDGMENT AFFIRMED IN PART; REVERSED IN PART AND REMANDED FOR FURTHER PROCEEDINGS NOT INCONSISTENT WITH THIS OPINION.

COSTS TO BE PAID BY APPELLEE.