590 A.2d 566

Calvert C. MERRIKEN, Jr.

v.

Joan C. MERRIKEN.

No. 1127, Sept. Term, 1990.

Court of Special Appeals of Maryland.

May 31, 1991.

Thomas Waxter, Jr. (Semmes, Bowen & Semmes, on the brief), Baltimore, for appellant.

Jerome T. May (Andrea E. Colender and Franch & Jarashow, P.A., on the brief), Annapolis, for appellee.

Argued before BISHOP and ALPERT, JJ., and GARY G. LEASURE, Judge, Specially Assigned.

ALPERT, Judge.

In this action, appellant, Calvert C. Merriken, Jr. ("Cal"), appeals an Opinion and Judgment issued by the Honorable Elroy G. Boyer of the Circuit Court for Kent County that granted appellee, Joan C. Merriken ("Joan"), a divorce on

the grounds of constructive desertion, entered a marital property award and judgment of $495,640 against Cal, and awarded Joan $30,000 in attorneys' fees. We are asked to consider:

I. Did the Court err in determining that the husband constructively deserted and/or abandoned his wife when the evidence failed to support that determination?

II. Did the Court err in creating marital property values by splitting the difference between the higher and lower present values offered by the respective parties?

III. Did the Court err in its finding that virtually 100% of the husband's property was marital when it consisted essentially of inherited properties?

IV. Did the Court err in finding the wife's property to be nonmarital by reason of inheritance where the wife failed to report it as inherited in estate returns and other sworn papers filed by her in judicial proceedings?

V. Did the Court err in concluding that "non-marital properties" and capital gains taxes were irrelevant in determining the marital award?

VI. Did the Court err in granting attorneys' fees in a marital property case in the absence of an applicable statute or rule?

## FACTS AND PROCEEDINGS

Joan C. Merriken and Cal C. Merriken were married in Delaware in June of 1951. Cal spent the first year of the marriage serving with the Armed Services in Korea while Joan taught school. After returning from Korea, Cal continued his education at Washington College and Joan continued teaching. Prior to receiving a degree, Cal left Washington College and went to work in Joan's father's fertilizer business. In July of 1953, their only child, Susan, was born, whereupon Joan stopped working.

In 1955, with the aid of Joan's family, Cal formed his own fertilizer business. He operated this business until he sold it in 1972. During this time, he also helped manage his

family's properties from their office in Denton ("the Denton business"). Cal's father was a lawyer and a landowner; and he, along with Cal's mother, brother, and other relatives, left Cal property that he has managed over the years. Cal inherited real estate and stock from both his parents' estates and from his father's real estate company, Merriken, Inc.

In 1956, Joan contracted tuberculosis and spent nearly a year away from her family in various hospitals. She finally was released from the hospital in April, 1957, at which time the Merriken family moved into "Chesmar," the house that Cal's father had begun to build for Cal and Joan in 1955. According to Joan, this house was a gift from Cal's father. She claims that she fully participated in choosing the lot and drawing up the plans for the house. She and Cal visited the construction site on numerous occasions, had free access to it, held it out to the world as their own, and had authority to make changes regarding the building plans. Construction on the house ceased in December of 1955 when Cal's father committed suicide. After a number of months went by, Cal proceeded to complete construction, using money loaned to him by his mother and what Joan claims were marital funds. Joan testified that she fully participated in Chesmar's care, maintenance, and improvement, and believed that she owned the house jointly with Cal. They lived in Chesmar until their final separation in February of 1986. She claims that she only learned from her attorney in this case that Cal individually bought Chesmar from Merriken, Inc. and that her name had never been on the deed.

According to Cal, his father picked out the lot for them and began building the house, but it was not completed at his death. Cal claims that his father never told Joan that he was giving her the house, nor was it even in his father's name. Cal paid for it to be finished, using a loan from his mother and a $10,000 inheritance from his grandfather. Cal alleges that none of Joan's money was used. Cal further explained that he bought the house from Merriken,

Inc. in 1957, using treasury stock that he inherited from his father.

Joan stayed home with Susan until 1963, when she became a full-time teacher. In 1967, she helped found the Kent School in Chestertown. She became its first headmistress, a position she still maintains.

During the early 1970's, Cal's mother and brother died. Susan, who had graduated from Goucher College and had become a CPA, married and moved out of the home. Joan claims that these events ultimately led to the deterioration of the parties' relationship. Cal's drinking became alcoholic rather than social, and he began to exhibit violent behavior. Joan was battered several times, hospitalized once, and advised to leave Cal by her family doctor, Dr. Dick.

In 1972, after the death of his brother, Cal sold the fertilizer business so that he could manage the Denton business on a full-time basis. Cal characterizes the business as involving properties that he received directly from Merriken, Inc., that he purchased, and that he inherited and then subdivided for sale of individual lots. His business activities have included collecting rents, managing family houses and rentals, selling timber from his properties, and leasing farmland. He alleges that "[h]is day-to-day income and operational expenses were a net loss but permitted him to hold the real estate for ultimate sale." Thus, although his activities in real estate management consistently lost money, he profited on the sale of the realty as well as the sale of timber. The lots comprising his major development, Passapae Landing, have all been sold but two. These sales brought substantial capital gains, totalling $209,658 in 1988. Cal says that all of the income from the Denton business went into a single bank account from which he made all purchases, collected all income and rents, and made all his disbursements. According to Cal, the Denton business was in his name, and all sources of income that flowed into the account were nonmarital. Joan virtually had no participation in the business.

Cal states that he also drew on the Denton business account for household expenses and personal bills. They had a common, joint food account into which Cal put several hundred dollars every month. Joan had a separate account from which she paid the maid, bought her clothing, and paid for her share of the taxes. Cal notes that Joan admitted that her salary went into her account and that she never contributed to his business and that he paid the house taxes, gas and electric, telephone, insurance, house maintenance, and cleaning bills. She managed her own property, maintained her own records, and had separate bank accounts. According to Cal, Joan paid no other regular household expenses other than paying for the maid and for her clothing. He says they "kept their substantial finances largely separate from the other."

According to Joan, Cal did not draw a salary from the Denton business, but drew funds from it as needed by the Merriken family. Household expenses were paid from Joan's bank account, into which she placed her entire salary, and Cal would make up any shortfall using the Denton account. They drew as little money from that account as possible in order that Cal could concentrate on building up the business for their future. Accordingly, they lived modestly. She fully participated in the business by continually discussing business matters with Cal, and by providing her input concerning decisions that needed to be made. She executed various documents for the business and was personally liable on various loans entered into for the business.

In 1985, Joan's mother died. Joan was appointed to be the estate's personal representative; she was its primary beneficiary. According to Joan, her mother had, several years prior to her death, given her certain bearer bonds in an envelope that was marked "The Property of Joan Culver Merriken," and also had given her some furniture and furnishings that were moved to Chesmar at Joan's mother's direction. Joan claims that she believed that these items of property did not have to be listed on the estate tax and therefore she did not list them. She added that if she had

been wrong, she would correct her mistake. Cal insists that these items should be regarded as marital property, not inherited or nonmarital property.

The parties separated on February 14, 1986. Joan claims that Cal pushed her out of the house that day, in the middle of a snow storm, and locked the door. She then told Cal that she would not consider reconciling until he did something about his drinking problem and his violent behavior and became involved in psychotherapy. On two further occasions, however, the parties cohabited. They took a week-long trip together to Florida in March of 1986, and Joan went with Cal to visit his relatives for Easter, at which time the two spent the night together.

Joan filed for divorce on September 14, 1987, seeking an absolute divorce on the alternative grounds of adultery, voluntary separation, and constructive desertion. She also sought attorney's fees. She amended her complaint on May 15, 1989, reiterating the aforementioned grounds for divorce and adding an alternative ground of two years separation. The parties entered into a lengthy stipulation detailing their respective positions concerning each item of property. The trial was held from September 18 through October 2, 1989. After the court granted Joan a divorce on the grounds of constructive desertion, entered a marital award and judgment against Cal, and awarded Joan attorney's fees, Cal noted this appeal.

The foregoing facts will be supplemented in the discussion, as relevant.

## I.

In its opinion, the trial court found that appellant had

constructively deserted and/or abandoned his wife in that his drinking and violent behavior made life intolerable for her and which conduct gave her no option but to leave the household. The desertion and/or abandonment has continued for a period in excess of one (1) year prior to the

filing of the Complaint in this case. Wife left the household and the parties finally separated on March 14, 1986. Appellant insists that the evidence did not support a finding that he had constructively deserted appellee. In any event, he argues, the week-long Florida vacation, during which the parties engaged in marital relations, amounted to condonation by appellee of his drinking and abusive behavior.

We first note that we deem that there *was* sufficient evidence before the trial court to support its finding. As documented *supra,* Cal had been abusive to Joan for nearly a decade before their separation. During his violent episodes, he had blackened her eyes, injured her in a manner that required hospitalization, pushed her, threatened her, damaged her personal property, and locked her out of their home. Their neighbors had had to call the police for Joan's protection. She testified that she lived in constant readiness of having to flee; she always had her coat and pocketbook near the door. The evidence of physical abuse was substantiated by her doctor's testimony. Cal even agreed that he drank too much and became violent. This behavior culminated in the incident during the snowstorm of February, 1986, wherein Cal locked Joan out of the house. She testified that she drove away, praying for the strength never to return. She then told Cal that she would not return until he improved his drinking and his violent behavior and began a program of psychotherapy. This evidence established

a pattern of persistent conduct which is detrimental to the safety or health of the complaining spouse, or so demeaning to his or her self-respect as to be intolerable.

*Murphy v. Murphy,* 248 Md. 455, 460, 237 A.2d 523 (1968).

We do not consider that Joan's cohabitation with Cal after she left amounted to condonation of his previous behavior.[1] Although we have stated that "resumption of marital relations is evidence of condonation," *see Moore v.*

---

1. Condonation is defined as "a conditional forgiveness of a marital offense." *Moore v. Moore,* 36 Md.App. 696, 699, 375 A.2d 37 (1977).

*Moore,* 36 Md.App. 696, 699, 375 A.2d 37 (1977), we quali-
fied that by noting that

> [w]hen misconduct is condoned, there is an implied prom-
> ise that the marital offenses or acts rendering the marital
> relation intolerable will not be repeated by the erring
> spouse and that the offended party will be treated with
> conjugal kindness. When the conditions upon which the
> original misconduct was condoned are breached, the origi-
> nal grievances are immediately revived as a cause or
> causes for divorce.

*Id.* at 699, 375 A.2d 37 (footnotes omitted); *see also Dorsey
v. Dorsey,* 245 Md. 703, 704, 227 A.2d 617 (1967) (holding
that "where the husband breaches [the implied condition
that he will not repeat the marital offenses] by maintaining
his illicit relationship, the right to the remedy for former
marital offenses revives").

In the case *sub judice,* it is clear that even assuming
*arguendo* that Joan condoned Cal's behavior by sleeping
with him in Florida in March and April of 1986, her "origi-
nal grievances [were] immediately revived" as a result of
his subsequent behavior. In part, Joan had conditioned
reconciliation on Cal's doing something about his drinking;
she was afraid of him when he was drunk because he
became violent. Cal himself testified that he still drinks
every day, although he claims to have moderated his drink-
ing. Furthermore, there was no real evidence before the
court that would suggest that Cal has worked on his violent
behavior, another of Joan's reasons for leaving. He still
drinks, which admittedly causes him to become violent.
Moreover, after having dinner together in early July of
1986 in Rehoboth, Cal grabbed Joan's breast while on a
public street and then called her a "bitch" when she was
taken aback by this advance and left her to get to her home
by herself. And, at this time in July, he had already
become involved with another woman, whom he had met on
June 1, 1986, and had taken to a stock car race in Dover
about a month later, before his dinner with Joan. As of the
end of July, he was sleeping with the other woman, and he

began living with her in September, 1986. Finally, although he had begun a psychotherapy program in December, 1985, this program ended in October, 1986.

The lower court had the opportunity to hear the witnesses and evaluate their testimony. Its findings of fact were supported by substantial evidence. We therefore determine that no error was committed in granting appellee a divorce on the grounds of constructive desertion.

## II. & III.

Appellant next contends that the court erred in its categorization and valuation of the properties in Exhibits 5 and 9. The crux of appellant's complaint is that the court erroneously found that certain properties were marital. The forthcoming analysis will indicate that we agree that the court improperly considered some of the factors constituting the monetary award, thus necessitating remand in order that there be a fair and equitable adjustment of the property interests of the parties.

### *Marital Property*

The current Maryland Property Disposition in Annulment and Divorce Act ("the Marital Property Act"), *see* Md. Fam.Law Code Ann. §§ 8–201 to –213 (1984 & Supp.1990) (formerly Md.Cts. & Jud.Proc.Code Ann. § 3–6A–01 to –08 (1980)) provides for "an equitable monetary award which is designed to accomplish an equitable division in an indirect manner." *Ohm v. Ohm*, 49 Md.App. 392, 396 n. 2, 431 A.2d 1371 (1981). The proper designation of marital property is crucial to fashioning a monetary award, because the value of nonmarital property is not subject to equitable distribution. *See Harper v. Harper*, 294 Md. 54, 81, 448 A.2d 916 (1982). We previously have explained that the concept of marital property was

> created by the legislature to describe the status of property acquired during the marriage, however titled (as defined in Md.Family Law Code Ann. §§ 8–201(e) (1984)),

title to which may have given rise to a potential inequity, upon dissolution of the marriage. That inequity, conceptually, may be corrected via a different legislative creature called the 'monetary award.' Thus, the only function of 'marital property' is to form a base for a 'monetary award.'

*Falise v. Falise*, 63 Md.App. 574, 580, 493 A.2d 385 (1985). To achieve this equitable distribution of marital property, the court must adhere to the three-step process outlined in the Marital Property Act. *See Harper*, 294 Md. at 79, 448 A.2d 916. Accordingly,

(1) if an equitable adjustment over and above the distribution of the spouse's property in accordance with its title is an issue, the court shall determine which property is marital property;

(2) the court shall then determine the value of all marital property;

(3) finally, the court *may* make a *monetary award as an adjustment* of the parties' 'equities and rights' concerning marital property.... *If* an award is deemed appropriate, the court shall then consider each of the [ten] factors enumerated in [§ 8–205(a)] in determining a fair and equitable amount and the method of its payment.

*Ward v. Ward*, 52 Md.App. 336, 339, 449 A.2d 443 (1982) (emphasis in original); *see also Harper*, 294 Md. at 79, 448 A.2d 916.

Statutorily, "marital property" is defined as "property, however titled, acquired by 1 or both parties during the marriage." Md.Fam.Law Code Ann. § 8–201(e)(1) (1984). The term "marital property" specifically excludes property that is:

(i) acquired before the marriage;

(ii) acquired by inheritance or gift from a third party;

(iii) excluded by valid agreement; or

(iv) directly traceable to any of these sources.

*Id.* § 8–201(e)(2). As in the case *sub judice*, "[t]he attempt to trace existing property to an excluded source may cause

considerable debate between husband and wife." J. Fader, II, and R. Gilbert, *Maryland Family Law* 387 (1990).

In *Harper*, the Court of Appeals addressed the concern that nonmarital property will be "transmuted" into marital property, in contravention of the clear legislative intent to preserve for spouses that which is nonmarital property. *See Harper*, 294 Md. at 80, 448 A.2d 916. To obviate this possibility, the Court adopted the "source of funds" theory.

> Under that theory, when property is acquired by an expenditure of both nonmarital and marital property, the property is characterized as part nonmarital and part marital. Thus, a spouse contributing nonmarital property is entitled to an interest in the property in the ratio of the nonmarital investment to the total nonmarital and marital investment in the property. The remaining property is characterized as marital property and its value is subject to equitable distribution. Thus, the spouse who contributed nonmarital funds, and the marital unit that contributed marital funds each receive a proportionate and fair return on their investment.

*Id.* at 80, 448 A.2d 916.

Appellant protests the categorization of the fifteen parcels in Exhibit 5. Seven properties were inherited: namely, the Houston Branch, Hynson–White, Eddington, Venable, and Mitchell timberland properties, and Passapae Lots 12 and 32. The latter two properties were developed as part of a subdivision. The remaining eight properties include Chesmar and seven properties purchased with what appellant claims were nonmarital funds—the Padgett property, the Kent Gunning Club, the Chestertown lot, the Stokely Office Building, the Carter/Parker lot, the Seymour property, and the Quillen property. The court found that all of these properties, although titled in appellant's name, were marital. In so doing, the court failed to act in accordance with the mandate of *Harper*, as it did not distinguish the nonmarital character of the properties.

Appellant should have been credited with the non-marital portion of the property, *i.e.*, that portion which he inherited or which is directly traceable to the inherited property; that value should have been excluded from the monetary award. Any monetary award that does not distinguish the value of inherited property held by one or both parties is in clear contravention to the Marital Property Act, which purposely excludes property "acquired by inheritance or gift from a third party." Md.Fam.Law Code Ann. § 8–201(e)(2)(ii) (1984). We define the value of the inherited property as the value that the property held at the time it was inherited, or such value as it has acquired by virtue of passive appreciation. Insofar as the value of inherited property is increased by the expenditure of marital funds for its upkeep and/or development, the amount of such increase or accretion is marital, and therefore is to be included in the monetary award. On remand, the value of the inherited property, as defined above, must be determined, and then excluded from the calculation of the monetary award.

■ We do not agree with appellant's contention that the court erred in characterizing as marital (1) the real property appellant purchased during the marriage and (2) the personal property, set forth in Exhibit 9, including stocks, bonds, IRAs, bank accounts, mortgages, and life insurance policies. Appellant insists that all of these properties were acquired with nonmarital funds, *i.e.*, from the sale of inherited properties or the income from the development of those properties. The trial court disagreed, and stated in its opinion:

> Mr. Merriken allegedly inherited a large quantity of real property from various members of his family. This property and any property acquired from a sale of any portion thereof, as discussed above, would normally be considered non-marital since it was inherited. However, due to Mr. Merriken's activity with regard to the property and any proceeds received therefrom, some of the character of the property was changed.

Although we conclude that, based on the evidence before it, the court properly determined that these properties were,

in part, marital because of appellant's active efforts to increase his inherited property and to further acquire properties, the court failed to assess the precise accretion of value due to appellant's efforts. Appellant's efforts during the marriage were "marital" efforts. For each property, it should have been determined whether appellant's efforts actively appreciated the value through the expenditure of funds for maintenance and/or development. Furthermore, appellee's efforts need to be considered. We explain.

In a number of cases, Maryland courts have addressed the issue of the appreciation during a marriage of erstwhile nonmarital property. In *Brodak v. Brodak*, 294 Md. 10, 447 A.2d 847 (1982), the husband had received a trailer park as a gift from his parents. *Id.* at 26, 447 A.2d 847. From the income produced from the park, three trailers were purchased during the marriage. *Id.* The trial court found that these trailers constituted marital property. *Id.* The husband argued to the Court of Appeals that the trial court had erred because the trailers could be directly traced to a gift. *Id.* Based on evidence that the wife had worked in the park after the gift was made, the Court upheld the trial court's decision on the grounds that "the income from the trailer park which provided the funds to purchase those trailers was partly generated through the efforts of the wife and thus cannot be said to be directly traceable to the gift." *Id.* at 27, 447 A.2d 847. In the instant case, although the wife did not work in her husband's business, it was her full-time work elsewhere that permitted nearly all of the funds generated by the husband's business to be reinvested in the business.

In *Gravenstine v. Gravenstine*, 58 Md.App. 158, 472 A.2d 1001 (1984), the husband bought stock before the parties married. *Id.* at 173, 472 A.2d 1001. Additional shares of the same stock were purchased during the marriage using marital cash and dividend reinvestments. *Id.* All shares were titled in the husband's name. *Id.* The wife testified that the parties agreed to reinvest the dividends, and that they were able to do so because "the parties' financial

arrangement obviated the need for the dividend money." *Id.* The chancellor ruled that the stocks acquired during the marriage were marital property. *Id.* The husband argued on appeal that (1) the stocks were nonmarital property because they originally were purchased before the marriage and (2) the dividends generated were nonmarital because they were directly traceable to nonmarital property. *Id.* The wife insisted that the stocks should be considered marital, "because 'but for her monetary contribution to the family's finances, the parties would have needed the dividends for other purposes.'" *Id.* at 173–74, 472 A.2d 1001. We applied the "source of funds" theory articulated in *Harper,* and upheld the chancellor's decision, because "[t]he evidence adduced demonstrated that the marital unit was able to purchase the additional securities due to appellee's contributions to the marriage's finances." *Id.* 58 Md. App. at 174, 472 A.2d 1001. Accordingly, the shares purchased during the marriage were marital property. *Id.* Moreover, because the new stocks had been purchased with marital funds supplied in part from money earned by the wife, they were no longer traceable to the nonmarital funds expended by appellant. *Id.* at 174–75, 472 A.2d 1001. As in *Gravenstine,* the character of the previously nonmarital property in the case *sub judice* was changed because the wife's contributions to the family finances freed the husband to reinvest his income in his property.

In *Mount v. Mount,* 59 Md.App. 538, 476 A.2d 1175 (1984), we held that shares of stock that were received during the marriage as dividends from stock owned by the husband prior to the marriage were "directly traceable" to the nonmarital stock and thus were not marital property. *Id.* at 549, 476 A.2d 1175. We noted that the record indicated that the parties had not contributed in any way to the acquisition of the additional stock; it was received by virtue of the husband's status as a shareholder. *Id.* at 549, 476 A.2d 1175. We stressed that:

> It is important to understand that our holding in this case is a limited one. Property can produce other property in

many different ways. In some instances, it may require active intervention and management by the owner or some assistance by the owner's spouse; in other instances, nonmarital property can accrete or produce income without any effort at all on the part of the owner or the owner's spouse.

*Id.* at 549–50, 476 A.2d 1175. In this case, much of the property appreciated due to the active management of its owner, and the assistance by appellee.

As in *Mount*, we held in *Wilen v. Wilen*, 61 Md.App. 337, 486 A.2d 775 (1985), that when the husband received additional stock during the marriage because he was already a stockholder in the corporation, the stock was directly traceable to property acquired prior to the marriage and therefore was not marital property. *Id.* at 348, 486 A.2d 775. The case before us is distinguishable because most of appellant's property did not appreciate just by mere virtue of his possession.

In *Rosenberg v. Rosenberg*, 64 Md.App. 487, 497 A.2d 485, *cert. denied*, 305 Md. 107, 501 A.2d 845 (1985), the wife argued that the husband's interest in four inherited trusts should be treated as marital property because the trusts increased in value during the marriage. *Id.* 64 Md.App. at 528, 497 A.2d 485. The chancellor found that the wife had not proven that the husband's personal efforts had increased the value of his interests. *Id.* at 530, 497 A.2d 485. He determined instead that the increased value was due to extrinsic economic factors. *Id.* He accordingly found that the accretion in the husband's interests was nonmarital property. *Id.* On appeal, we held that these findings were not clearly erroneous. *Id.* at 530–31, 497 A.2d 485. In the instant case, there was sufficient evidence to permit the court to decide that the accretion in some of appellant's interests was due to his efforts, thus making these interests marital property.

In *McNaughton v. McNaughton*, 74 Md.App. 490, 538 A.2d 1193 (1988), we addressed the issue of "whether the appreciation of non-marital stock in [a closely held corpora-

tion] may be considered a marital asset where the appreciation may be due to the efforts of the owner spouse during the marriage." *Id.* at 491–92, 538 A.2d 1193. The wife contended that the marital property should include appreciation to gifts of corporate stock received by the husband from his parents prior to and during the marriage. *Id.* at 497, 538 A.2d 1193. She argued that her nonmonetary contribution had permitted her husband to increase the work efforts he expended in his parents' corporation during their marriage, thus increasing the value of the stock. *Id.* at 497, 538 A.2d 1193. We upheld the chancellor's rejection of this argument, on the grounds that it was impossible to "form any basis, other than speculation, as to what proportion, if any, of the increase in the initial non-marital shares was attributable to Bruce McNaughton's work as an officer and employee in the corporation." *Id.* at 501, 538 A.2d 1193.

In the case at bar, the evidence of how Cal Merriken's efforts increased the value of the inherited properties was not merely speculative. For seventeen years, appellant was involved in the Denton business on a part-time basis. Since 1972, his activities in the business were his full-time occupation. He did much more than merely maintain or preserve the property. He actively improved, developed, and timbered some of the properties. Appellant's efforts, expended during the marriage, earned income and increased the value of some of the properties. These efforts are in contrast to, for example, dividends on stock that require no activity on the part of the stockholder.

A prime example of how appellant's activities during his marriage directly caused the appreciation of his properties is the development of the Passapae property into subdivided lots. Appellant had spent significant amounts of time and money to develop this property, which he had inherited as raw land. The property was sold in lots, and appellant functions as a "banker" by holding mortgages on many of these lots. Appellant would not have been able to expend these efforts if appellee had not been working full-time and

contributing her earnings to the household. Appellee's efforts allowed appellant to invest all his time in the Denton business and to reinvest the proceeds from the Denton properties into new properties.

As for the proceeds of these properties, such as the bonds, stocks, IRAs, and insurance policies, they cannot be traced entirely to the nonmarital property, because it is impossible to discern whether they were acquired as part of appellant's active efforts on behalf of the Denton business. Furthermore, in accordance with *Brodak*, appellee's contributions to her husband's business transformed the nature of the proceeds of nonmarital property into marital property.

Appellant maintained one bank account into which he deposited all of his funds from whatever source. He paid all business and personal expenses out of this account, and his contributions to the family unit were from this account.

> Since [appellant] commingled his income from non-marital sources with his marital income, no specific sum of money used to acquire property or reduce an indebtedness on any property can be traced to any source. This inability to trace property acquired during the marriage *directly* to a non-marital source simply means that all property so acquired was marital property.

*Melrod v. Melrod*, 83 Md.App. 180, 187, 574 A.2d 1 (1990) (emphasis in original).

Based on the foregoing, we conclude that appellant's active efforts in regard to certain of his properties have transformed the character of a portion of those previously nonmarital properties into partly marital property. Had appellant drawn a salary, it would have been marital property. Instead, appellee contributed her salary to the family so that appellant could reinvest his money into the business. On remand, it must be determined which properties actively increased due to appellant's efforts and which income from the business was due to appellant's efforts, and then the dollar value of those efforts must be ascertained. From

that, the court must determine the value of the accretion; that value is marital property. The trial court incorrectly included the initial value of the inherited properties in its monetary award. This miscalculation must be corrected upon remand.

### Disposition of "Chesmar"

In its opinion, the trial court stated:

this court believes that Mr. Merriken, Sr. had the intent to build the house for both his son and daughter-in-law. This court believes that Mr. Merriken, Sr. would not have built the house if his son had not been married and in the process of raising a family. Therefore, it is this Court's opinion that the family home known as Chesmar was a gift to the parties and is marital property.

Appellant insists that the finding that Chesmar was marital property and a gift to both parties from the senior Merriken was erroneous. We agree.

■ The frequently recited "requirements for a valid *inter vivos* gift are an intention on the part of the donor to transfer the property, a delivery by the donor and an acceptance by the donee." *Rogers v. Rogers*, 271 Md. 603, 607, 319 A.2d 119 (1974); *see also Dorsey v. Dorsey*, 302 Md. 312, 318, 487 A.2d 1181 (1985); *Boehm v. Harrington*, 54 Md.App. 345, 354, 458 A.2d 885 (1983). The record indicates that there may have been evidence sufficient to establish the donative intent of Cal's father, given that both parties testified that he was building the house for them to live in because he had done the same thing for Cal's brother. The evidence does not, however, prove that there was delivery, a requirement that is indispensable to an *inter vivos* gift. *See Brooks v. Mitchell*, 163 Md. 1, 11, 161 A. 261 (1932).

"Delivery may be actual or constructive...." *Hamilton v. Caplan*, 69 Md.App. 566, 573, 518 A.2d 1087 (1987). When delivery merely is constructive, " 'it must be as nearly perfect and complete as the nature of the property

and the attendant circumstances and conditions will permit.'" *Brooks*, 163 Md. at 12, 161 A. 261. In this case, there is no evidence that the senior Merriken delivered the property in the manner that one would "deliver" a gift.

■ "The general rule is that a parol gift of land, accompanied by possession by the donee, will be be enforced in equity, when the donee has been induced by the promise of the gift to make valuable improvements to the land...." 38 C.J.S. *Gifts* § 57 (1943); *see also Withers v. Douglas*, 206 Md. 141, 144, 110 A.2d 513 (1955). When, however, the "improvements [were] made and paid for by a donor, even though they were made for the benefit of the donee, or were in the nature of a gift to the donee, [they] cannot be regarded as improvements by the donee within the rule." 38 C.J.S. *Gifts* § 57 (1943); *see also Hodgson v. Hodgson*, 28 Ga.App. 250, 110 S.E. 754, 755 (1922). At the time of Mr. Merriken's death, neither Cal nor Joan Merriken had made any such improvements on the property, and the only improvements had been those made by Mr. Merriken, the alleged donor.

■ Chesmar, then, was not a gift. Nor was it completely marital property, as it was bought by Cal Merriken from his father's corporation with what the parties agree was inherited property, namely, $15,000 of treasury stock from his father. Although Cal spent $17,855 to complete construction of the house, $7,855 of that sum clearly was nonmarital, as it was obtained from an E bond inherited from his grandfather. The remaining $10,000 is arguably marital, at least in part. The evidence reveals that this money was received as a loan from Cal's mother, and was repaid during the marriage. Therefore, it must be determined by the trial court on remand whether the loan was repaid by virtue of what Cal Merriken gained through his business efforts, in which case it was repaid using marital funds.

## IV.

Appellant argues that because appellee failed to include some items on her mother's estate tax return, she should be precluded from considering these items to be nonmarital property. We shall quickly dispose of this argument as we find it to be wholly without merit.

Appellee testified below that she believed that the items did not have to be listed on the estate tax return. She thought that she had done the right thing, but stated that she would correct it if she had made a mistake. She explained that she had not included certain bearer bonds given to her by her mother because those were given to her several years prior to her mother's death, and therefore did not seem to be part of her mother's estate. Similarly, she considered her mother's furniture to be hers, because she received it three years prior to her mother's death when her mother moved to a nursing home. A certain Cecil County Tax Free Bond did not appear on the return, because she purchased it after her mother's death, having cashed in a CD that appeared on the tax return. Finally, appellee testified that she owned Delaware license tag number 607. The tag had been on her mother's car; appellee sold the car before her mother's death and placed the tag on Cal's car, where it remained until this case began.

Given the evidence before it, the trial court clearly was justified in finding that these assets indeed were inherited property. We reject appellant's argument that the rules of equity or estoppel should preclude these assets from being treated as nonmarital property. Appellant has presented no law that suggests that a failure to list property on a tax return destroys the inherited status of the property. Accordingly, we uphold the trial court's findings here.

## V.

Appellant next contends that the monetary award constituted an abuse of discretion and an error of law because (1) it disregarded Joan's nonmarital assets, which exceed

$1,400,000, and (2) it ignored the effect of the capital gains taxes that Cal would incur because he would have to sell nearly $800,000 of his assets to generate the funds to satisfy the marital award.

### A. *The Nonmarital Assets*

Appellant's contention that the trial court failed to consider adequately appellee's nonmarital property is supported both by the record and by the court's opinion. The court at one point stated, "[w]ell, it's non-marital property, so it has no bearing on anything." Appellee argues that appellant has taken this comment out of its context. We disagree. Appellant had been explaining to the court how he valued a piece of property that had been stipulated as nonmarital by the parties. His explanation was cut short by the court's statement concerning nonmarital property. This statement demonstrates that the court did not give much credence, if any, to the value of nonmarital property. Furthermore, although appellee notes that the court also stated, "as I recall Family Law Article 8–205, subsection C, it says if the Court is to make any monetary award it must consider the economic circumstances of both parties," this statement was not made in relation to nonmarital property; instead, it related to how appellant drew income for tax purposes.

The court's opinion also indicates that it did not consider the nonmarital property factor. The court tabulated the total value of the marital property and the value of the marital property titled in each party's name, but did not tabulate the value of the nonmarital property, neither in its aggregate nor as held by each party. Although it is true that the court included exhibits setting forth the nonmarital property held by the parties, these exhibits merely served to rubber-stamp the stipulation of the parties concerning the nonmarital character of certain properties, and do not establish any active deliberation in respect to the nonmarital property.

This inattention to the nonmarital property is in derogation of the court's statutory obligation to consider "the value of all property interests of each party," *see* Md. Fam.Law Code Ann. § 8–205(b)(2) (Supp.1990), and "the economic circumstances of each party ..." *Id.* § 8–205(b)(3). Upon remand, the court must demonstrate that it considered the impact of the nonmarital property before fashioning a new monetary award.

## B. *The Capital Gains Taxes*

Our review of the record reveals that the issue of the tax implications of the monetary award was neither raised in nor decided by the trial court. Although it was not preserved, we shall address this contention for the benefit of the trial court on remand.

We recently reiterated our holding that the "potential tax consequences of a disposition of property should be considered as an 'other factor' pursuant to Md.Fam.Law Code Ann. § 8–205(b)(10)." *Quinn v. Quinn,* 83 Md.App. 460, 473, 575 A.2d 764 (1990) (citing *Williams v. Williams,* 71 Md.App. 22, 37, 523 A.2d 1025 (1987)). If, on remand, appellant presents evidence of the potential capital gains tax effect, the court must consider that factor in making a monetary award, provided that the evidence is "more than merely speculative." *Quinn,* 83 Md.App. at 473, 575 A.2d 764; *see also Williams,* 71 Md.App. at 37, 523 A.2d 1025; *Rosenberg v. Rosenberg,* 64 Md.App. 487, 526, 497 A.2d 485 (1985).

## VI.

Finally, we reach appellant's contention that the lower court erred in granting $30,000 in attorney's fees to appellee. Appellee had requested that the court grant her attorney's fees in the sum of $75,000 and that payment of court costs be imposed upon appellant. Judge Boyer noted in his opinion that

[t]he basis for this request is that the position taken by Mr. Merriken in regards to his inherited property was

unjustified and not in good faith. Mrs. Merriken also alleges that the position Mr. Merriken has taken with regards to the property she inherited was not justified and was not in good faith.

Thus, his apparent basis for awarding the attorney's fees would be Maryland Rule 1–341, the rule upon which Mrs. Merriken admittedly based her claim for attorney's fees. It provides that:

In any civil action, if the court finds that the conduct of any party in maintaining or defending any proceeding was in bad faith or without substantial justification the court may require the offending party or the attorney advising the conduct or both of them to pay to the adverse party the costs of the proceeding and the reasonable expenses, including reasonable attorney's fees, incurred by the adverse party in opposing it.

We agree with appellant that the trial court erred in granting these attorney's fees. The court did not specifically find that appellant had acted either in bad faith [2] or with a lack of substantial justification, which is a necessary predicate for the imposition of rule 1–341 sanctions. *See Colonial Carpets, Inc. v. Carpet Fair,* 36 Md.App. 583, 591, 374 A.2d 419 (1977); *Hess v. Chalmers,* 33 Md.App. 541, 545, 365 A.2d 294 (1976).[3] Thus, although it is true that we recognize that "[j]udges are presumed to know the law ... [and to] apply the law correctly ...," *see Hebb v. State,* 31 Md.App. 493, 499, 356 A.2d 583 (1976),

when as here, there is, in the trial judge's opinion, not the slightest indication that he relied upon [rule 1–341], coupled with the fact that none of the findings required by that rule was made, the presumption yields to the clear inference that the judge either (1) failed to rely upon [rule

---

**2.** In fact, Judge Boyer specifically stated that he did "not believe that the positions taken by Mr. Merriken were in bad faith."

**3.** Both *Colonial Carpets, Inc.* and *Hess* involved the award of attorney's fees under former rule 604b, from which rule 1–341 substantially was derived.

1–341] or (2) if he did rely upon it, he failed to make the requisite finding so as to impose validly the sanctions it authorizes.

*Colonial Carpets, Inc.,* 36 Md.App. at 592, 374 A.2d 419. The court's opinion does not demonstrate that the court perceived that appellant acted in a manner which would justify the imposition of rule 1–341 sanctions. Accordingly, we reverse the award of attorney's fees.

JUDGMENT AFFIRMED IN PART AND REVERSED IN PART; CASE REMANDED FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. COSTS TO BE DIVIDED EQUALLY BETWEEN THE PARTIES.