695 A.2d 1231

Yvonne GOLDEN,

v.

Gary GOLDEN.

No. 1595, Sept. Term, 1996.

Court of Special Appeals of Maryland.

June 27, 1997.

James B. Hopewell, Riverdale, for Appellant.

Carla M. Mathers (James E. McCollum, Jr. and James E. McCollum, Jr. & Associates, P.C., on the brief), College Park, for Appellee.

Argued before MOYLAN and CATHELL, JJ., and ROSALYN B. BELL (retired), Specially Assigned.

CATHELL, Judge.

Yvonne Golden appeals from a decision of the Circuit Court for Prince George's County rendered during a divorce proceeding that found that there existed an oral agreement to exclude from marital property any property accumulated during the marriage or traceable to assets accumulated during the marriage between herself and Gary Golden, appellee. She presents several questions on appeal:

1. Can the parties to a marriage enter into an oral agreement to *exclude* from marital property: [a] all assets then known, [b] all assets then unknown, and [c] all

assets acquired during the marriage, subsequent to the alleged oral agreement?

2. Did the circuit court err in finding that the parties entered into an oral agreement, unsupported by any writing, excluding all known, unknown, and subsequently acquired property from consideration as marital property?

3. Did the circuit court err in finding certain assets not to be marital property, even though the parties stipulated they were marital property?

4. Did the court err in finding that the assets appellee transferred to his family, after having an argument with appellant, came from assets which originated before the marriage?

5. Did the circuit court err in ruling that the appellant should be denied an equitable share of the marital home?

## The Facts

The parties were married in 1982 [1] and divorced in 1995 based upon a two-year separation. When they married, each already owned property located in other jurisdictions. During the divorce proceedings, neither party claimed that these properties that they brought into the marriage were marital property. Both parties were employed during the marriage. Each kept a separate bank account. Additionally, they established a joint account for household expenses.

In 1984, the parties separated, with appellant moving to her District of Columbia residence, while appellee remained at his Virginia property. After efforts to reconcile were undertaken, appellee moved into appellant's District of Columbia residence. Shortly after the reconciliation, the parties purchased a home together in Maryland. They each kept their prior residences. Each party contributed $14,000 to the down payment of the marital home, which was located in Cheverly. During the

---

1. Appellant's brief erroneously states 1992.

period when the parties were reconciled, they shared proportionately in family expenses.

Difficulties again developed between the parties. Ultimately, appellant left the Maryland home and moved back into her District of Columbia residence; this litigation ensued, during which appellee alleged the existence of an oral agreement between the parties as to the disposition of the parties' interests in marital property.

The trial court opined:

The nature of the financial arrangements between these parties is crucial to this case. The evidence is abundantly clear that before and after marriage, these parties, with the exception of the joint account for household expenses, handled their money and their investments as though unmarried. Neither accounted to the other for expenditures nor investments nor loans nor gifts to third parties. Mrs. Golden loaned money to her brother for a car and to her aunt for a beauty shop. They each bought cars in their own names without input from the other, neither drove the cars belonging to the other. They kept separate bank accounts in their sole names, they attended different churches. He has invested approximately $150,000 since the marriage, some of which came from previous investments, some from his Dale City rental, and some from marital wages. It is not possible to separate and identify which funds were marital. . . .

. . . .

Even if some of the assets accumulated by these parties are part marital, there is no accurate way to trace the source of funds from this evidence.

Each was aware of the monetary gifts by the other to relatives. No complaints were registered by either. Each kept their financial records inaccessible to the other. . . .

After evaluating the evidence and the credibility of the witnesses, this court specifically finds as a fact that at the time of and at all times thereafter, there was an agreement in place between these parties that their property was sole

and separate, except for the marital home in Cheverly, which is jointly owned. There was a specific intention that no other property, including pensions, was to be marital property, as evidenced by the manner in which they conducted their affairs. Both parties relied on the agreement in investing and handling their financial affairs. The court does not find Mrs. Golden's [appellant's] assertions and claims to be credible. She asserts a "what's mine is mine, and what's yours is ours" mentality. Sec. 8–101 of the Family Law Article states that marital partners may make agreements respecting their property. There is no requirement that such an agreement be in writing.

The parties separated in 1993; the joint marital account was closed out four to five months prior to that when the wife stopped contributing. Since the separation, Mr. Golden [appellee], who remained in the Cheverly house, has paid $35,800 on mortgage payments. Mrs. Golden has paid none. He is entitled to *Crawford* payments as set forth hereafter.

. . . .

The plaintiff [appellant] did not satisfy this court by a preponderance of evidence, taken as a whole and evaluating the credibility of witnesses, that the items she claims as marital property are indeed marital property. To the contrary, the agreement between the parties shows there was no intention for any property except Cheverly to be joint or marital.

No acts nor contributions of either contributed to, detracted from, nor otherwise affected the pension or other monetary position of the other. Had they not married, each would be in the same financial position in which they find themselves today. Because of the marriage they are both richer by one asset only—the Cheverly house.

The only evidence of any agreement between the parties to which we have been directed was their testimony. Appellant's testimony included:

Q. Now, what other [financial] arrangements did you and Mr. Golden make at the time [of the marriage]?

. . . .

A.  We had a joint account that we contributed to . . . for the expenses for the marriage.

. . . .

Q.  . . . [H]ow long did that arrangement continue?

A.  Throughout the marriage.

. . . .

Q.  Now, while you lived in Washington, what were the arrangements . . . regarding . . . family expenses?

A.  . . . [H]e did contribute some toward the expenses. . . .

. . . .

Q.  Tell us what happened?

A.  . . . Gary [appellee] wanted us to move back to Dale City.  I refused.  I figured our problem was that when we were in his house, and he was saying, well, this is mine, this is mine, this is mine.

So, basically, I thought that we would have a chance, if we bought something together. . . .  We would buy this house together.

. . . [I]t wouldn't be a thing of mine or yours. . . .  It would be ours[ ] together.

She then testified as to their finances in respect to the Maryland house the parties bought together:

A.  In 1987 I was earning approximately $22,000.

. . . .

A.  He was earning approximately $57,000.

. . . .

A.  . . . I was paying something like $350 [monthly].

. . . .

A.  He was paying something like a thousand.

Q.  And, why was there a difference?

A.  Because, his salary was much more than mine.

Later, she testified further as to the overall financial arrangements during the marriage.  She testified as to premari-

tal assets, including a settlement from a car accident in which she had been involved and in which her mother was killed. She also testified as to the existence of a 401–K plan and her bank account. On cross-examination, the following colloquy took place:

Q. You are aware of the fact that during that period [the five-year period before the parties' marriage in 1982] that Mr. Golden was concerned about his finances, and he was very careful about how he spent money, correct?

A. That I beg to differ. It changed radically.

. . . .

Q. When you moved into the Dale City home [after the marriage], were you aware of how much the mortgage was on that home that Mr. Golden was paying?

A. No. . . .

Q. And, in fact with respect to your Washington D.C. property, Mr. Golden had nothing to do with the mortgage on there, did he? . . .

A. . . . [I]t was just that it basically evolved that way. He had his house. I had my house, and [he] paid his, and I paid mine.

. . . .

A. Yes. When [financial] situations would arise, we discussed them, and we decided how to handle them. It wasn't really like an agreement or a written agreement or verbal agreement I don't think at this time. It just evolved that way.

Later, she was cross-examined about deposition testimony she was supposed to have given:

Q. And, you recall admitting at the time that his money was his, and your money was yours?

A. No. I don't recall saying that.

. . . .

Q. And, in fact, there never was any suggestion . . . that you both maintain all of your income in one account, was there?

A.   No, there wasn't.

. . . .

A.   I don't know about our intentions.   It just happened that way.

Later, either continuing on cross or on redirect examination, she testified:

[W]e could meet each other half and half, but he really did want this home. . . .   I was telling him, listen, I don't bring in but so much, so I wouldn't be able to meet him, you know, half and half on this, and he was in agreement with this.

Later, on a continuation of cross-examination, she testified:

Q.   Now, the funds that went into that joint account, those were funds that you and Mr. Golden contributed *yourself from your income*.   Is that correct?

A.   That's correct.   [Emphasis added.]

Then, as to the properties each party owned prior to the marriage and maintained under separate ownership during the marriage, the following exchange occurred.   Appellant was questioned initially about her Washington, D.C. residence:

Q.   But you had purchased that property in terms of the initial interest . . . while you were not married to Mr. Golden.   Is that your testimony?

A.   That's correct, I did.

Q.   And since the time that you have been married to him, you have been paying on the mortgage.   Is that right?

A.   That's correct.

Q.   But you still consider that property to be your sole property?

A.   That is my sole property.

Q.   . . . And . . . at some point during the marriage you were receiving rental income from that property?

A.   That's correct.

Q.   And that rental income . . . you put into your own separate account.   Is that right?

A.   That's correct.

A similar line of questioning as to Mr. Golden's Virginia property was then put to appellant. After establishing that appellee paid the mortgage on that property, appellant was asked:

Q. But by the same token, you agreed that that property was his sole property?

A. Yes.

Later, she was asked about her bank accounts and retirement accounts:

Q. ... [Y]ou consider those funds to be your sole funds. Isn't that right?

A. ... [T]here's a retirement account at Penn Mutual.... [T]hat's the IRA.

. . . .

Q. And that was acquired upon your marriage to Mr. Golden. Is that right?

A. Part of it, because its direct from the retirement from—the little bit of retirement that I got from NBW, and I was hired at NBW in '78.

. . . .

Q. So, a portion of it was acquired during your marriage and a portion of it before you got married?

A. That's correct.

She was then questioned about other investments, some before the marriage, and was eventually asked:

Q. As far as you were concerned, were those funds solely your money?

A. As far as I was concerned, yes.

. . . .

Q. And most of the money ... was acquired during your marriage. Isn't that right? ...

A. Yeah, I would say so.

The direction of the questioning of her then turned towards appellee's assets:

Q. Did you ever discuss with Mr. Golden anything about his retirement accounts?

A. No, and he never did discuss anything about mine.

. . . .

A. ... [T]he way that it turned out, I already had accounts.... He had accounts, too.... As far as joining or what—it just evolved that way. It wasn't this is mine or—I'm pretty sure as far as he was concerned, what [is] his is his, but I don't—I didn't come from that type of family.

She was asked specifically on redirect:

Q. So, just to follow up on the last issue, there was never an agreement between you and Mr. Golden about anything other than—

A. No.

Q. —the Cheverly property when you listed that for sale. Is that correct?

A. Right.

Q. And in addition to that, both [of] you understood that the houses you had owned before the marriage were yours?

A. That's correct.

Q. And there wasn't any other agreement on any other things, was there?

A. No.

Mr. Golden's testimony, in relevant part, included the following:

Q. ... [D]id you ever discuss with her your financial status prior to your marriage?

A. Not a great detail. I told her I had money market accounts, I had stocks, savings bonds, mostly municipal bonds....

Q. Did you ever discuss with her how much money you had?

A. No.

. . . .

A. During our marriage, I paid 75, 80 percent of the household account, until I guess about 1992.

. . . .

[A.] The mortgage, ... the electricity, the gas, the water.

. . . .

Q. ... [T]ell us how your financial arrangement was with your wife ... ?

A. ... I would put about 75 percent in there and she would put about 25 percent in there, based on her income.

. . . .

Q. ... And with respect to any other monies that you would receive in your income, what if anything was your understanding with respect to those monies?

A. Our agreement was what's mine was mine and hers is hers.

He later testified as to investments made during the marriage:

Q. ... [A]ll told, during your marriage ... how much money would you say that you invested in either stocks, municipal bonds or CDs?

. . . .

Q. So, an additional [$]150,000 you invested—

A. Yes.

. . . .

Q. And what was the source of that money?

A. Primarily, from two sources. From the investments that I ... had prior to the marriage. The other source is from my wages that I had ... prior to the marriage ... and ... a small amount [from marital income]. . . .

He was then questioned about the joint statement of marital assets:

Q. —to numerous of those assets, you and she dispute ownership. Is that correct?

A. Yes.

. . . .

Q. Okay. And with respect to the property that is in dispute, do you maintain that the property is—that is in your name only is your sole property?

A. Yes.

Q. And on what do you base that?

A. I base it on a number of things. Our verbal agreement that her, her money was her money, her assets were her assets.

There then occurred a discussion of several gifts totaling over $133,000 that appellee gave to his parents and to his sister, because, according to appellee, he was depressed over the marital problems he was experiencing. Eventually, on cross-examination, he was asked:

Q. ... You claimed ... that you and your wife had an agreement where your property was yours and hers was hers?

A. Yes.

Q. Was that ever in writing?

A. ... So, to answer your question, her property was hers, and my property was mine.

. . . .

A. We had verbal agreements. We had a lot of agreements in our house that were not written.

On other occasions, appellee recited his opinion that they had an agreement, but the terms of that agreement were always stated as "what was hers was hers and what was mine was mine."

We have included an extensive recitation of the testimony of the parties as to their financial arrangements and appellee's assertion that an oral marital property settlement agreement existed because the trial court based most of its other findings on its initial finding that the parties had an agreement. We perceive that the finding of an oral property settlement agreement was erroneous. We perceive of nothing in the testimony or evidence in this case that would constitute an agreement

sufficient to bind the parties to it or to support the trial judge's finding.

## The Law

*Falise v. Falise*, 63 Md.App. 574, 493 A.2d 385 (1985), is instructive. There, the parties had separated and entered into a formal separation agreement. The parties subsequently reconciled and built a jointly owned house during the reconciliation. The initial issue was what effect the prior separation agreement, which contained an ownership waiver as to after-acquired property, had on the ownership of the house. Mrs. Falise argued that her interest in the newly built house was presumed to be a gift to her upon the titling of it as *tenants by the entireties* and that the separation agreement was inoperative because it was abrogated by virtue of their reconciliation. We first opined:

> [E]ven if the separation agreement was not abrogated, the unimproved lot of ground acquired by appellant during the separation must be classified as "marital" and not as "nonmarital" property.

> It is clear that by paragraph 13 of the agreement the parties intended to relinquish any and all right, title and interest in and to the other's property, then owned or thereafter acquired. We doubt that the subject agreement could affect the status of something which is neither an interest in real or personal property, *i.e.*, marital property. Marital property is merely a term created by the legislature to describe the status of property acquired during the marriage, however titled (as defined in Md. Family Law Code Ann. § 8–201(e) (1984)), title to which may have given rise to a potential inequity, upon dissolution of the marriage. That inequity, conceptually, may be corrected via a different legislative creature called the "monetary award." Thus, the only function of "marital property" is to form a base for a "monetary award." The legislature never intended that either spouse could have a legal *interest* in the "marital property" of the other since it merely intended to cure the

title created inequity through the issuance of a "monetary award."

*Id.* at 580, 493 A.2d 385. We held explicitly:

> In order to exclude property "by valid agreement" from the reach of a monetary award, we believe that the parties must specifically provide that the subject property must be considered "non marital" or in some other terms specifically exclude the property from the scope of the Marital Property Act.

*Id.* at 581, 493 A.2d 385.

■ Accordingly, in the case *sub judice,* the trial court's finding that an agreement existed "between these parties that their property was sole and separate" is clearly erroneous. We would doubt, although we do not now specifically hold, that a "what is hers is hers and what is mine is mine" oral agreement, no matter how often repeated, could ever contain the degree of specificity required by *Falise, i.e.,* "the parties must specifically provide that the subject property must be considered 'non marital' or in some other terms specifically exclude the property from the scope of the Marital Property Act." *Falise,* 63 Md.App. at 581, 493 A.2d 385. Accordingly, we shall vacate the trial court's judgment on this issue.

■ On remand, the trial court is reminded that income from all sources to either spouse during a marriage is generally income of the marriage and that, to the extent any such funds are used to purchase other investments, marital property is thereby created. Moreover, to the extent the value of nonmarital property has been increased by the utilization of marital funds, *e.g.,* mortgage payments, taxes, repairs, etc., that new or added value is, itself, marital property. The trial court is further reminded that, under the source-of-funds theory, when any mixture of marital and nonmarital property exists, to the extent it cannot be traced to nonmarital funds, it is marital. On this point, see *Merriken v. Merriken,* 87 Md.App. 522, 535, 590 A.2d 566 (1991), where we said: "Insofar as the value of inherited property is increased by the expenditure of marital funds for its upkeep ... the amount of

such increase ... is marital...." We then opined, "For each property, it should have been determined whether appellant's efforts actively appreciated the value through the expenditure of funds for maintenance and/or development." *Id.* at 536, 590 A.2d 566.

Also relevant to the case at bar is *Gravenstine v. Gravenstine,* 58 Md.App. 158, 472 A.2d 1001 (1984), where, prior to the marriage, the husband owned certain securities. During the marriage, dividends were reinvested in the stocks. The husband maintained that because the original shares were nonmarital, the additional shares acquired by reinvesting the dividends were also nonmarital. We opined:

> Appellee responds that the stocks acquired during marriage were marital property because "but for her monetary contribution to the family's finances, the parties would have needed the dividends for other purposes."
>
> . . . .
>
> ... [T]he evidence showed that appellant could afford to purchase new shares and reinvest the dividends only because of appellee's marital contributions. Since the new securities were purchased with marital funds supplied in part from money earned by appellee, the new shares were no longer traceable to nonmarital funds originally expended by appellant.

*Id.* at 173–75, 472 A.2d 1001.

We have held that no agreement as to property disposition existed. Accordingly, on remand, the trial court shall have to reconsider whether the additional investments by either party in their respective real and personal properties constitute the investment of marital property. If so, the marital property will have to be valued. In other words, the trial court shall have to comply with the three-step process described in *Merriken. See also Hoffman v. Hoffman,* 93 Md.App. 704, 712–13, 614 A.2d 988 (1992).

In the present case, the trial court opined, "It is not possible to separate and identify which funds were marital." The court, however, avoided the problem of making a determina-

tion by finding that an agreement existed. On remand, the trial judge is reminded of the dictates of *Noffsinger v. Noffsinger*, 95 Md.App. 265, 281, 620 A.2d 415, *cert. denied*, 331 Md. 197, 627 A.2d 539 (1993):

> Any property acquired during the marriage that cannot be directly traced to a nonmarital source is marital property. . . .
>
> The party who asserts a marital property interest bears the burden of producing evidence of the *identity* and value of the property. Generally, the burden of proving a fact is on the party bearing the affirmative of the issue. When attempting to demonstrate that property acquired during the marriage is nonmarital, the party with this burden must directly trace the property to a nonmarital source.

*Id.* at 281–82, 620 A.2d 415 (emphasis added) (citations omitted).

█ Accordingly, as to all of the value increases of property resulting from the expenditure of either party's marital income, including investment income during the marriage, and from nonmarital income or sources as well, the party asserting that a portion is nonmarital bears the burden of tracing the expenditure to nonmarital funds. If he or she cannot do so, the increase in value is considered to be marital property.

Because the trial court based the entirety of its decision on the existence of an agreement that we have determined did not validly exist, we shall vacate the entire judgment, including the matter of the alleged gifts to appellant's relatives, except for the granting of the divorce. On remand, except for the divorce, all matters of property classification and valuation should be addressed, and the calculation of monetary award, if any, should be computed and, if necessary, relitigated. In addition, the issue of contribution needs to be reconsidered since the funds used for the house payments apparently were marital.

Before concluding, we note that there was no claim for alimony below, and the trial court's denial of alimony was not appealed. In order, however, to ensure that the issue is final,

we shall, for the record, affirm the trial court's denial of alimony.

**JUDGMENT OF DIVORCE AFFIRMED; JUDGMENT DENYING ALIMONY AFFIRMED; JUDGMENT OTHERWISE VACATED; COSTS TO BE PAID BY APPELLEE.**