752 A.2d 291

**Nicholas Raymond INNERBICHLER**

v.

**Carole Jean INNERBICHLER.**

**No. 0149, Sept. Term, 1999.**

Court of Special Appeals of Maryland.

June 16, 2000.

208

212

Allen J. Kruger (Elizabeth A. Proctor, on the brief), Laurel, for appellant.

Jerrold A. Thrope (Sheila K. Sachs and Gordon, Feinblatt, Rothman, Hoffberger & Hollander, LLC, on the brief), Baltimore, for appellee.

Argued before MURPHY, C.J., and HOLLANDER and ADKINS, JJ.

## ON MOTION FOR RECONSIDERATION

HOLLANDER, Judge.

This appeal arises from the dissolution of the marriage of Nicholas R. Innerbichler, appellant, and Carole Jean Innerbichler, appellee.[1] After more than fourteen years of marriage, the parties were granted a divorce by the Circuit Court for Prince George's County, pursuant to an order dated July 27,

---

1. The record contains a "Notice of Cross–Appeal" filed by appellee on March 5, 1999. We note, however, that appellee does not refer to herself as a cross-appellant in her brief, nor has she posed questions for our resolution. Therefore, we have not referred to appellee as a cross-appellant.

1998, and modified on January 13, 1999. Two aspects of the court's orders are at the heart of this appeal: 1) the monetary award to appellee, in the amount of $2,581,864.75, which was based, in part, on the court's determination that the appreciation in value of appellant's 51% ownership interest in Technical and Management Services Corporation ("TAMSCO") constituted marital property; and 2) the court's award to appellee of monthly alimony of $8000.00 for five years, followed by indefinite monthly alimony of $6,000.00.

Appellant noted a timely appeal to this Court,[2] posing several questions for our consideration, which we have rephrased slightly:

I. Did the trial court err in granting the monetary award to appellee by:

 A. Improperly finding that the increase in value in TAMSCO was marital property?

 B. Failing to consider the tax liabilities of TAMSCO?

 C. Improperly calculating the premarital value of TAMSCO?

II. Did the trial court err in the manner in which it required payment of the monetary award?

III. Did the trial court err in its granting of alimony to appellee?

For the reasons stated below, we conclude that the court erred only with respect to its valuation of appellant's premarital interest in TAMSCO. For that reason, we shall vacate the judgment and remand for further proceedings in accordance with this opinion.

---

**2.** We filed our original reported opinion in the instant appeal on April 6, 2000. Thereafter, appellant filed a "Motion To Reconsider and For Clarification/Correction." Upon consideration of the motion, appellee's opposition thereto, and appellant's reply, we have granted the motion in order to clarify and correct portions of our original opinion. Accordingly, we have recalled the opinion of April 6, 2000, and this amended opinion has been filed in its place. We note that the outcome of the amended opinion is the same as the original opinion.

## FACTUAL SUMMARY

The parties were married on January 21, 1984, when Mr. Innerbichler (the "Husband") was 41 years old and appellee (the "Wife") was 33. Although appellant had been married twice before, it was appellee's first marriage. The parties have one child, Michelle Nicole, who was born on May 1, 1986. Appellant also has three adult children from prior marriages.

In 1995, after eleven years of marriage, the Husband moved out of the marital home.[3] On September 12, 1995, he filed a Complaint for Limited Divorce, and the Wife filed a counter-suit, seeking an absolute divorce on the ground of adultery. Her suit was later amended in court to include a two-year separation as an additional ground for divorce.

Trial consumed almost eight days in January and February 1998, at which the court heard testimony from thirteen witnesses, including the parties; Raymond Grossman, an economist who testified for appellant as an expert in business valuation and appraised TAMSCO; Larry Stokes, an accountant for TAMSCO; William Bilawa, appellant's business partner; Charles Smolkin, appellee's vocational expert; Lawrence J. Eisenberg, an ERISA and pension benefits expert who testified for the Husband; and Douglas S. Land, an expert in the field of business valuation who testified for the Wife. Numerous exhibits were also admitted into evidence. The primary disputes centered on the fair market value of TAMSCO, whether the appreciation in value of TAMSCO constituted marital property, and, if so, the value of the marital interest.

At the time of trial, appellant was 55 years old and resided with his paramour in a home that he purchased for about $600,000.00 and financed with a mortgage and a loan from his business. Appellee was a 47–year–old high school graduate who had completed one semester of college. The trial culmi-

---

**3.** We note that the court below indicated that the couple separated in February 1995. Yet appellee claims in her brief that they separated in March 1995, and appellant's Complaint for Limited Divorce states that they separated in July 1995.

nated in a divorce based on the parties' separation of two years. What follows is a summary of the evidence adduced at trial pertinent to the issues raised on appeal.

In October 1982, more than one year prior to the parties' marriage, appellant co-founded TAMSCO with his friend and colleague, William Bilawa. At the time, appellant was employed by Lockheed Corporation, and remained employed there until June 1983; in the evenings, appellant worked for TAMSCO. The company provides technical and management services to agencies of the federal government and to the private sector in various disciplines, including program management, integrated logistics support, software development, and data management. At the relevant time, appellant owned 51% of TAMSCO and Bilawa owned a 49% interest in the company.[4]

When TAMSCO was founded, appellant was married to Barbara Innerbichler ("Barbara"). In 1983, as part of his divorce settlement with Barbara, appellant claimed that he waived his interest in the home that they occupied, allegedly worth about $300,000.00, in exchange for Barbara's agreement to waive her claim to TAMSCO, which appellant contends was worth at least as much as the home.[5]

In June 1983, about six months before appellant's marriage to appellee, appellant submitted an application on behalf of TAMSCO to the United States Small Business Administration ("SBA") to obtain "8(a) certification." According to appellant, who is an Hispanic American, the "8(a) program" was established during the Nixon years to assist small businesses owned and controlled by socially and economically disadvantaged persons. In order to qualify for such certification, the appli-

---

**4.** The parties agree that appellant's recent 2% reduction in the percentage of his ownership interest of TAMSCO is not relevant to the issues before us.

**5.** We do not address the merits of appellant's claim that he relinquished a valid claim to the home, which apparently was titled in Barbara's name and acquired by her before their marriage. We note only that this was appellant's position below.

cant company must demonstrate reasonable prospects for business success as well as financial stability and viability. Moreover, the disadvantaged individual upon whom eligibility is based must own at least 51% of the applicant business.

Appellee insists that TAMSCO was in its "embryonic stages" when the parties were first married. Ample evidence was presented at trial showing that TAMSCO was in its fledgling stage of development at the time of the marriage.

According to the 8(a) application, submitted in June 1983, TAMSCO was "a new business" with only two employees, and its operating equipment consisted of two electric typewriters, a bookcase, a file cabinet, a conference table, and chairs, having a total value of less than $2,000.00. Although appellant maintains in his brief that, at the time of TAMSCO's 8(a) application, TAMSCO "had already completed contracts of significant value and had other contracts pending, all of which established its viability to the SBA," the SBA application listed only two contracts that TAMSCO had completed in the preceding three years: a $13,000.00 contract commenced in February 1983 and a $6,000.00 contract completed in May 1983. The application also identified a contract of $131,000.00 and described it as "In Progress." Further, the application reflected that financing was "generally unavailable" to TAM-SCO, either for working capital or long term loans, and noted that vendors would not extend "normal credit terms." Moreover, TAMSCO operated from Bilawa's kitchen until August 1984, when it opened its first office in Fort Monmouth, New Jersey. In addition, TAMSCO's income tax return for 1983 revealed that the company had only $52,076.00 in gross receipts and $41,268.00 in assets.

On April 14, 1984, some 83 days after the parties' marriage, TAMSCO obtained the desired 8(a) certification. It is undisputed that the 8(a) program enabled TAMSCO to obtain lucrative sole source government contracts, the first of which was awarded to TAMSCO in September 1984. TAMSCO grew rapidly after the award of the 8(a) certification. For fiscal year 1983, the company reported approximately $52,-000.00 in revenues, and $188,000.00 in revenues for fiscal year

1984. By the end of fiscal year 1992, TAMSCO had been awarded contracts totaling $356,439,719. For 1995, TAMSCO generated revenues of $46 million and employed over 500 people. In 1996, TAMSCO earned $47,000,000.00 in revenues, followed by $51,000,000.00 for fiscal year 1997.

From 1984 through 1989, approximately 85% of TAMSCO's work related to 8(a) contracts, and from 1989 until 1993, approximately 75% of TAMSCO's work derived from those contracts. When TAMSCO left the SBA's 8(a) program in 1993, it had already received approximately $356,000,000.00 in 8(a) revenue. By the time of the divorce trial, however, TAMSCO was no longer eligible to participate in the SBA's 8(a) program, although it still had residual 8(a) business. According to appellant, because TAMSCO could no longer "pursue contracts in a non-competitive marketplace," its business position had declined. Nevertheless, at the time of trial, appellant was earning in excess of $650,000.00 in annual salary.

Although appellant concedes that most of TAMSCO's lucrative contracts were obtained and performed after his marriage to appellee, he maintains that neither TAMSCO nor the post-marriage appreciation in the company's value constituted marital property. He argues that the company was created before the marriage and its success was directly linked to an Army contract awarded prior to the marriage. Appellant points out that, in October 1993, while the 8(a) application was still pending, TAMSCO was notified that it had "won" a non–8(a) contract with the Army, worth in excess of one million dollars. Thus, he claims that over 97% of TAMSCO's government contracts were "traceable to contracts won at the company's inception and prior to the marriage." To support his position at trial, appellant submitted an exhibit depicting the success of TAMSCO as a "family tree," with the 8(a) Army contract as the trunk. The branches of the tree refer to numerous other contracts with the government, including the Coast Guard and the Air Force, which generated millions of dollars in revenue for TAMSCO. Although the Army contract

was "awarded" on January 1, 1984, shortly before the parties' marriage, performance of the Army contract did not begin until the summer of 1984, after the parties were married.

At trial, appellant also maintained that he was not solely responsible for TAMSCO's success. To the contrary, he asserted that both he and Bilawa were responsible for making many of the important corporate decisions. Appellant also contends here, as he did below, that TAMSCO "flourished" as a result of many "external factors" unrelated to appellant, including the "dramatic increase in defense spending" and "the expanding defense industry during the Reagan Administration," as well as the company's 8(a) status.

Nevertheless, the record includes substantial evidence establishing that appellant was the architect of TAMSCO's growth. For example, appellant served as the President and Chief Executive Officer of TAMSCO from its inception and Bilawa reported to him. Moreover, a resolution adopted by TAMSCO's Board of Directors affirmed appellant's "total control of the day-to-day operation" of TAMSCO, with authority to give "final approval on all matters concerning the operation of the corporation." Additionally, an Informal Action of the Board in July 1988 recognized appellant's efforts and role in TAMSCO's growth and financial stability.

Further, appellant acknowledged that he functioned as TAMSCO's "quarterback" with respect to seeking and performing contracts. Indeed, in his trial testimony, appellant took credit for TAMSCO's success, stating: "I've done a good job in listening to my people and taking that company where it should have gone." At his deposition, about which appellant was questioned at trial, appellant described his role at TAMSCO, stating:

I am responsible for the day-to-day operation of the company, make major decisions with respect to what we are going to bid on, what we are not going to bid on, what we are going to market, how the various operations are going at a high level.

Appellant's testimony on December 13, 1985, before the United States House of Representatives Committee on Small Business, was also admitted in evidence. There, appellant acknowledged that the By–Laws gave him "complete control of the corporation." As corporate president, he recognized that his powers and duties included "control of all [TAMSCO's] business affairs and properties." Further, appellant said: "As any manager and employee of TAMSCO or as my peers in the industry can attest, I always have maintained control of [TAMSCO's] operation and retain, in all matters, final approval relative to operations."

Bilawa conceded at trial that appellant consistently made the final decisions regarding TAMSCO. He testified:

> If [decisions are] purely contractual issues, then normally I make them, where already under contract. If they're strategic, going off and pursue some new work or spend dollars to, to pursue our other work, proposal dollars, things like that, [appellant] and I normally discuss that together and usually with our staff. And finally, based on what the information is that we are, are looking at, [appellant] finally makes the decision, yes or no, up or down.

As we noted, a central point of contention concerned the value of TAMSCO. Evidence was presented as to two disputes between TAMSCO and the IRS and their effect on TAMSCO's value. One dispute concerned the company's 1990–1992 corporate income tax returns and the other involved its 401(k) plan.

Because TAMSCO had mistakenly filed Subchapter C tax returns from 1985 through the fiscal year ending September 30, 1992, the IRS sought to terminate its status as a Subchapter S corporation. As of trial, the IRS had already issued tax deficiencies against TAMSCO in the amount of $2,000,000. Moreover, by the time of trial, TAMSCO had lost at least three administrative hearings, but it had not yet capitulated. Instead, TAMSCO's appeal to the United States Tax Court was pending, with a hearing set for February 19, 1998. Larry Stokes, TAMSCO's accountant, testified as an expert. He

said that if TAMSCO did not prevail, it could face a tax liability of almost nine million dollars, including interest and costs, for the years 1990–1997.

The record contains correspondence authored by Lawrence Garr, Esquire, an attorney representing TAMSCO in the tax matter.[6] In a letter of March 15, 1996, written by Garr to Chevy Chase Bank, one of TAMSCO's lenders, Garr stated, in pertinent part:

> The purpose of this letter is to provide you with the evidence and legal theories which will be provided to the IRS. They demonstrate that TAMSCO never revoked its subchapter S election and its shareholders never filed shareholder consents consenting to any revocation. Based on the facts of this case, TAMSCO can demonstrate that its subchapter C status was not revoked or otherwise terminated in 1995 or any other year prior to the formation of its subsidiary in 1992. No court would hold otherwise.

On March 20, 1997, Garr wrote another letter to Chevy Chase Bank, stating: "[W]e continue to be optimistic that the legal analysis set forth in our letter to you and in the ruling request which was attached to it is correct and that TAMSCO will ultimately prevail." On September 12, 1997, Garr corresponded with Crestar Bank, another lender, enclosing copies of the 1996 and 1997 letters to Chevy Chase Bank. Garr advised Crestar that it was "expressly authorized to rely [on the letters] as if they had been addressed to you, we are optimistic our legal argument will be sustained, either by concession or a favorable decision by the United States Tax Court."

Evidence was also adduced that the IRS had begun an audit of TAMSCO's 401(k) Plan for 1995. Lawrence Eisenberg, an ERISA and pension benefits expert, testified for TAMSCO as to that dispute. He said that, at the "high end of possibilities," the IRS could disqualify TAMSCO's 401(k) Plan and impose liabilities of as much as $2,000,000.00. On the other

---

6. Garr did not testify as a witness.

hand, he opined that the "low end" of possibilities ranged between $200,000.00 and $250,000.00 in liability, with his "best estimate" of liability ranging between $200,000.00 and $500,-000.00. Appellee did not present evidence to contradict Eisenberg's opinion, but suggested that, if the company is liable, it might pursue a claim to recover from the Plan's administrator.

Douglas Land, an expert in business evaluation who testified for the Wife, valued TAMSCO at between $8.3 million and $8.5 million. He also calculated the value of appellant's 51% interest in TAMSCO at between $4,150,000.00 and $4,250,-000.00. Land did not reduce the fair market value of TAMSCO due to the company's disputes with the IRS, because the potential tax liabilities had "never been reflected on financial statements," and the company "represented to the bank [that it] was not an issue that was going to be adverse to the company."

Raymond Grossman, an economist, testified as an expert for the Husband. He estimated the present value of TAMSCO at $6,555,000.00. According to Grossman, TAMSCO's value was adversely affected by the two disputes with the IRS. As to the Subchapter S matter, he claimed that TAMSCO had a potential tax liability of $3,233,000.00, which he assumed would occur in 1999. Grossman also testified to a projected liability of $709,000.00 as a result of the 401(k) dispute. Moreover, he believed that TAMSCO suffered a "distinct lack of saleability...." After using alternative approaches to valuation, he said: "In my opinion, three million is the best number" for the fair market value of TAMSCO. Accordingly, he valued the Husband's 51% interest in TAMSCO at $1,530,000.00. The following exchange is relevant.

[APPELLANT'S COUNSEL]: [Y]ou heard the potential [liability] of the S corp is nine million, the potential of the 401-K is over two million. You didn't subtract eleven million from the assets, did you?

[MR. GROSSMAN]: No. Based upon the estimates that we had for the impact of the IRS issue and 401-K and the timing of those processes as best it could be estimated, we

estimated an impact by the end of fiscal [year] 1999 and then present valued that.

Appellee sought to establish that she had no prospects for lucrative employment. When the parties wed, appellee was employed in a secretarial capacity at the National Academy of Sciences, where she worked for five years prior to the marriage and almost two years thereafter. Her responsibilities included scheduling appointments, typing, answering phones, filing, and word processing. Upon departure from that job, her salary was $26,000.00.

In September 1985, appellee began to work as TAMSCO's personnel director, earning approximately $65,000.00 per year. Appellee worked full-time in that capacity for five years, and thirty hours a week once the couple's child started school. Although the Wife had employees at TAMSCO who reported to her, she maintained that she was not qualified for the position she held at TAMSCO, and that others executed the functions she could not perform. Thus, she asserted that she could not find employment comparable to her TAMSCO position. She also claimed that she suffered from carpal tunnel syndrome in both wrists, which prevented her from performing work as a secretary.

Ms. Innerbichler explained that, in view of her lack of skills and her physical condition, she had decided to become a preschool teacher, a position for which she was also unqualified. Appellee presented testimony that it would take at least five years of education for her to obtain the requisite degree, at which time she would be 52 years of age and could expect to earn $26,000.00 per year, the same salary she was earning in 1985. In an effort to justify her change of careers, appellee argued at trial that she was overcompensated by TAMSCO for her services.

In 1991, appellee began psychological treatment for depression and, at the time of trial, she was taking Zoloft, a prescription medicine, for that condition. In addition to her work outside the home, appellee served as the primary caretaker for the couple's home and child. Indeed, the trial judge

found that the Wife had "almost exclusive responsibility" for the home, the couple's child, and for the care of appellant's three other children.

By 1994, appellant had developed a serious gambling problem. He began a treatment program in April 1997 for a gambling addiction. Apparently, he has not gambled since then. The parties disagreed about the extent to which appellant's gambling problem resulted in the dissipation of marital funds.

On July 27, 1998, the court issued a thorough and well-reasoned opinion and order.[7] The court awarded appellee monthly alimony of $8,000.00 for five years, based, in part, on appellee's anticipated educational expenses. That was followed by an award of indefinite monthly alimony of $6,000.00, based on the court's finding of an unconscionable disparity in income even if the Wife becomes as self-supporting as possible. Additionally, the court initially granted a monetary award to the Wife in the amount of $2,880,000.00.

The monetary award was based largely on the court's determination as to TAMSCO's value. The court expressly indicated that it found the testimony of the Wife's expert as to TAMSCO's value "more persuasive" than appellant's expert. Based on the opinion of the Wife's expert, the court concluded that TAMSCO had a fair market value of $8.3 million. The court also determined that appellant's 51% ownership interest in TAMSCO was worth $4,233,000.00, and that appellant's pre-marital interest in TAMSCO was worth $153,000.00.

Additionally, the court found that the post-marriage "increase in value of TAMSCO is marital," and that "the Husband's share (51%) of the increased value of TAMSCO stock is marital," because TAMSCO's "success is attributable to a

---

7. Most of the court's rulings are not at issue on appeal. For example, the court awarded joint legal custody of Michelle. Appellant was also ordered to pay $3,276.00 per month in child support and $150,000.00 toward appellee's attorney's fees. Appellee was also given use and possession of the family home for a three year period, to be followed by sale of the home and equal division of the proceeds.

large degree to the work efforts of the Husband throughout the marriage." The court explained: "He was the president of the company and was more responsible for the mission and rating of TAMSCO than his partner. He made the ultimate decisions on the contracts and was actively involved in making presentations to the early contracting parties which generated the value of TAMSCO." The judge also relied on an informal action of TAMSCO's Board of Directors in July 1988, which acknowledged that "without [appellant] and his personal efforts, the contracts, the past corporate growth and financial stability would not have been realized by the corporation." Further, the court observed that TAMSCO earned less than $60,000.00 before the marriage, and that most of the "contracts which formed the basis of TAMSCO's value were entered into after the marriage."

The court also found that the parties had substantial other marital property, worth almost $1.5 million. In calculating the value of the parties' other marital property, however, the court rejected the Wife's request to include appellant's investment of almost $4 million dollars of marital funds to launch two business ventures, one known as "Sea–Mats" and the other referred to as "TRAMS."

Although appellant and his partner invested approximately $6.2 million in Sea–Mats, the court relied on Grossman, appellant's expert, who testified that Sea–Mats had no present value and its future value was speculative. Therefore, the court rejected the Wife's attempt to value the Husband's interest in Sea Mats at its historical cost, which would have recognized the $3 million that had been invested by Mr. Innerbichler. Appellant and his business partner also invested approximately $1,200,000.00 in TRAMS. Like Sea–Mats, it was not financially profitable at the time of trial. Therefore, the court declined to recognize the $600,000.00 that had been invested for the Husband's interest.

Following post-trial motions, the court entered a revised order on January 28, 1999, in which it concluded that the total marital value of TAMSCO was $4,080,000.00. Further, it

determined that the total value of marital assets, including TAMSCO, equaled $5,576,280.50. Exclusive of TAMSCO, the court found that appellee had $74,653.00 in property titled to her, appellant had property worth $1,367,991.50 titled to him, and the parties had $53,636.00 in joint property. After awarding appellee $104,804.50 as her share of appellant's pension, the court recalculated the monetary award and reduced it to $2,581,864.75. The court then ordered appellant to make full payment of that sum over a five year period, without interest. Of that sum, $430,310.79 was due by July 27, 1999.

We shall include additional facts in our discussion.

## DISCUSSION

### A.

As we noted, the court determined that TAMSCO had a value of $8,300,000.00, and appellant's 51% ownership interest amounted to $4,233,000.00. After deducting appellant's pre-marital interest in TAMSCO of $153,000.00, the court arrived at the sum of $4,080,000.00 as the post-marital value of appellant's 51% interest. In effect, the trial court attributed all of the appreciation to appellant's efforts; 51% of that appreciation, corresponding to appellant's ownership interest, represented marital property for purposes of the monetary award. The court then concluded that appellee was entitled to half of the marital property; her share amounted to $2,788,-140.25. After deducting $104,804.50 for the pension transfer, and $74,653.00 for the marital property titled in appellee's name, the court granted the Wife a monetary award of $2,581,864.75.

Title 8 of the Family Law Article of the Maryland Code provides for the equitable distribution of marital property. " 'Marital Property' means the property, however titled, acquired by 1 or both parties during the marriage." F.L. § 8–201(e)(1). Pursuant to F.L. § 8–201(e)(3), marital property does not include property that is:

 (i) acquired before the marriage;

 (ii) acquired by inheritance or gift from a third party;

 (iii) excluded by valid agreement; or

 (iv) directly traceable to any of these sources.

■■■■ Property that is initially non-marital can become marital, however. *See Brodak v. Brodak*, 294 Md. 10, 26–27, 447 A.2d 847 (1982). Moreover, the party who asserts a marital interest in property bears the burden of producing evidence as to the identity of the property. *Noffsinger v. Noffsinger*, 95 Md.App. 265, 281, 620 A.2d 415, *cert. denied*, 331 Md. 197, 627 A.2d 539 (1993). Conversely, "[t]he party seeking to demonstrate that particular property acquired during the marriage is nonmarital must trace the property to a nonmarital source." *Id.* at 283, 620 A.2d 415; *see Golden v. Golden*, 116 Md.App. 190, 205, 695 A.2d 1231, *cert. denied*, 347 Md. 681, 702 A.2d 290 (1997) (recognizing that the increased value of property acquired during the marriage is marital property, unless it can be directly traced to a non-marital source). *See also Harper v. Harper*, 294 Md. 54, 69–70, 448 A.2d 916 (1982). If a property interest cannot be traced to a nonmarital source, it is considered marital property. *Noffsinger*, 95 Md.App. at 281, 620 A.2d 415; *see Melrod v. Melrod*, 83 Md.App. 180, 187, 574 A.2d 1, *cert. denied*, 321 Md. 67, 580 A.2d 1077 (1990).

■■■ Under circumstances when the division of marital property by title is inequitable, the court may adjust the equities by granting a monetary award. *See Long v. Long*, 129 Md.App. 554, 579, 743 A.2d 281 (2000) (recognizing that the judge has "all the discretion and flexibility he needs to reach a truly equitable outcome.") In *Ward v. Ward*, 52 Md.App. 336, 339–40, 449 A.2d 443 (1982), we explained the concept of the monetary award, stating:

 The monetary award is . . . an addition to and not a substitution for a legal division of the property accumulated during marriage, according to title. It is "intended to compensate a spouse who holds title to less than an equitable portion" of that property. . . . What triggers operation of the statute is the claim that a *division* of the parties'

property according to its title would create an inequity which would be overcome through a monetary award.

(Internal citation omitted).

■ When a party petitions for a monetary award, the trial court must first follow a three-step procedure. Md.Code (1984, 1999 Repl.Vol.), §§ 8–203, 8–204, 8–205 of the Family Law Article ("F.L."). *See Ware v. Ware,* 131 Md.App. 207, 213, 748 A.2d 1031 (2000); *Doser v. Doser,* 106 Md.App. 329, 349–50, 664 A.2d 453 (1995). First, for each disputed item of property, the court must determine whether it is marital or nonmarital. F.L. §§ 8–201(e)(1); 8–203. Second, the court must determine the value of all marital property. F.L. § 8–204. Third, the court must decide if the division of marital property according to title will be unfair; if so, the court *may* make a monetary award to rectify any inequity "created by the way in which property acquired during marriage happened to be titled." *Doser,* 106 Md.App. at 349, 664 A.2d 453; *see* F.L. § 8–205(a); *Dobbyn v. Dobbyn,* 57 Md.App. 662, 679, 471 A.2d 1068 (1984). In doing so, the court must consider the statutory factors contained in F.L. § 8–205(b). *Ware,* 131 Md.App. at 213–14, 748 A.2d 1031; *Doser,* 106 Md.App. at 350, 664 A.2d 453.

F.L. § 8–205(b) states:

(b) *Factors in determining amount and method of payment or terms of transfer.*—The court shall determine the amount and the method of payment of a monetary award, or the terms of the transfer of the interest in the pension, retirement, profit sharing, or deferred compensation plan, or both, after considering each of the following factors:

(1) the contributions, monetary and nonmonetary, of each party to the well-being of the family;

(2) the value of all property interests of each party;

(3) the economic circumstances of each party at the time the award is to be made;

(4) the circumstances that contributed to the estrangement of the parties;

(5) the duration of the marriage;

(6) the age of each party;

(7) the physical and mental condition of each party;

(8) how and when specific marital property or interest in the pension, retirement, profit sharing, or deferred compensation plan, was acquired, including the effort expended by each party in accumulating the marital property or the interest in the pension, retirement, profit sharing, or deferred compensation plan, or both;

(9) the contribution by either party of property described in § 8–201(e)(3) of this subtitle to the acquisition of real property held by the parties as tenants by the entirety;

(10) any award of alimony and any award or other provision that the court has made with respect to family use personal property or the family home; and

(11) any other factor that the court considers necessary or appropriate to consider in order to arrive at a fair and equitable monetary award or transfer of an interest in the pension, retirement, profit sharing, or deferred compensation plan, or both.

 The standard of review governing the court's determination as to marital property is relevant here. Ordinarily, it is a question of fact as to whether all or a portion of an asset is marital or non-marital property. Findings of this type are subject to review under the clearly erroneous standard embodied by Md. Rule 8–131(c); we will not disturb a factual finding unless it is clearly erroneous. *Noffsinger*, 95 Md.App. at 285, 620 A.2d 415 (citation omitted); *Hollander v. Hollander*, 89 Md.App. 156, 175, 597 A.2d 1012 (1991). Md. Rule 8–131(c) states:

When an action has been tried without a jury, the appellate court will review the case on both the law and the evidence. It will not set aside the judgment of the trial court on the evidence unless clearly erroneous, and will give due regard to the opportunity of the trial court to judge the credibility of the witnesses.

*See Oliver v. Hays*, 121 Md.App. 292, 305–06, 708 A.2d 1140 (1998); *Nicholson Air Servs., Inc. v. Board of County*

*Comm'rs,* 120 Md.App. 47, 66–67, 706 A.2d 124 (1998). When the trial court's findings are supported by substantial evidence, the findings are not clearly erroneous. *Ryan v. Thurston,* 276 Md. 390, 392, 347 A.2d 834 (1975); *Sea Watch Stores Ltd. Liab. Co. v. Council of Unit Owners of Sea Watch Condominium,* 115 Md.App. 5, 31, 691 A.2d 750, *cert. dismissed,* 347 Md. 622, 702 A.2d 260 (1997).

With respect to the ultimate decision regarding whether to grant a monetary award and the amount of such an award, a discretionary standard of review applies. *Alston v. Alston,* 331 Md. 496, 504, 629 A.2d 70 (1993); *Ware,* 131 Md.App. at 214, 748 A.2d 1031; *Gallagher v. Gallagher,* 118 Md.App. 567, 576, 703 A.2d 850 (1997); *Doser,* 106 Md.App. at 350, 664 A.2d 453. This means that we may not substitute our judgment for that of the fact finder, even if we might have reached a different result.

As we noted earlier, the trial court made several critical findings as to TAMSCO, including that the appreciation of TAMSCO constituted marital property because the company's dramatic success was "attributable to a large degree to the work efforts" of appellant. For purposes of calculating the monetary award, the court also concluded that 51% of that appreciation, corresponding to appellant's ownership interest in the company, was marital property.

As we previously observed, appellant contends that the court erred in finding that TAMSCO constituted marital property. He argues that "TAMSCO was brought into the marriage as an established, flourishing non-marital asset. By the time the parties married, the ground work had already been laid to make TAMSCO a success." In addition, the Husband quarrels with the court's decision to attribute the appreciation of TAMSCO solely to his efforts. He maintains that TAMSCO's growth was the result of the efforts of many people as well as several other factors, such as the thriving defense industry. In his view, "[t]his is a classic case of being in the right place at the right time." Moreover, appellant complains that the court should not have treated 51% of the appreciation

as marital property, merely because he owned 51% of the company. Appellant asserts that the court was required to ascertain the precise portion of TAMSCO's increase in value for which appellant was responsible, and that only the portion attributable to his work efforts could qualify as marital property.

The court was not clearly erroneous in rejecting appellant's claim that TAMSCO was entirely non-marital property. Although it is undisputed that TAMSCO was created before the marriage, the evidence that we summarized earlier supported the court's conclusion that TAMSCO's value soared after the marriage. For example, when TAMSCO submitted its application for SBA 8(a) certification in June 1983, it had only completed a $13,000.00 contract and a $6,000.00 contract, and a $131,000.00 contract was in progress. Moreover, TAMSCO owned little in the way of tangible property. At the time of the marriage, the business had only two full-time employees and operated from Bilawa's kitchen. TAMSCO received its 8(a) certification after the marriage, and all of the 8(a) contracts were performed during the marriage. By the time TAMSCO graduated from the SBA Section 8(a) program in 1993, it had received over $356,000,000.00 in Section 8(a) revenue, placing it among the top 10 such firms nationally.

Appellant also challenges the court's decision to treat all of the appreciation as marital property. He relies on the court's own acknowledgment that appellant was merely responsible, "to a large degree" (and thus not entirely), for the increased value. On the other hand, appellant also seems to suggest that the court miscalculated the monetary award, because it did not find that all of the appreciation was marital property.

We are of the view that the court found that all of TAMSCO's appreciation constituted marital property, and it attributed all of the appreciation to appellant's work efforts. After comparing the financial status of TAMSCO before and after the marriage, the court focused on the extent of appellant's role in the corporation and his work efforts on behalf of

TAMSCO, concluding that *"the increase* in value of TAMSCO is marital...." (Emphasis added). Significantly, the court did not qualify its statement by saying words to the effect that *some* of the increase or *part* of the increase in value is marital. The common sense construction of the court's pronouncement is that it determined that *all* of the appreciation was marital.

Moreover, notwithstanding the court's statement that appellant was responsible "to a large degree" for TAMSCO's success, we are satisfied that the court did not err, on the record before it, when it attributed all of the appreciation to appellant's efforts for purposes of calculating the monetary award. It follows that the court did not err by failing to assign a specific percentage of responsibility to appellant in achieving that corporate growth.

In reaching our conclusion, we believe appellant has inappropriately focused on the court's use of the words "to a large degree," ignoring other critical parts of the opinion. The court said "the increase," *i.e., all* of the increase, was marital property. All of it could not constitute marital property unless all of the increase was attributable to appellant's work efforts. Moreover, in the context of the whole opinion, it is patently clear that the court was convinced that appellant was the dominant force in TAMSCO's success. Appellant, who served as the President and Chief Executive Officer of TAM-SCO from its inception, was responsible for the company's day-to-day operations of the company, exercised control over its affairs, and was the architect of TAMSCO's huge financial profitability. The trial judge's use of a figure of speech does not detract from her message. Therefore, we will not engage in the semantic hair splitting that appellant urges.

Despite appellant's protestations, we pause to question whether the court truly could have ascertained, with either genuine accuracy, mathematical certainty, or scientific precision, the exact extent to which appellant's efforts led to TAMSCO's success. Although we acknowledge that it is rare for one person singularly to wear all hats in the operation of a complex, technical, multi-million dollar business enterprise

such as TAMSCO, one person can function in a capacity critical to a company's growth and development. Here, the court was clearly satisfied from the evidence that appellant was the driving force in TAMSCO's huge financial growth. It is equally apparent that, because of appellant's vital and instrumental role in TAMSCO's success, the court did not assign to appellant an arbitrary percentage of responsibility for the increased corporate value.

In determining the marital or non-marital character of disputed property that has its origins as non-marital property, the cases distinguish between passive ownership and increases in value resulting from the active efforts of the owner-spouse. *See Wilen v. Wilen,* 61 Md.App. 337, 354–55, 486 A.2d 775 (1985). In *Mount v. Mount,* 59 Md.App. 538, 549–50, 476 A.2d 1175 (1984), we recognized that there are various ways in which property that increases in value may become marital. We said:

> Property can produce other property in many different ways. In some instances, it may require active intervention and management by the owner or some assistance by the owner's spouse; in other instances, non-marital property can accrete or produce income without any effort at all on the part of the owner or the owner's spouse. In either case, all, some, or none of the income or accretion generated by or from the initial property may be used for family purposes. When one superimposes upon these variables the further varieties in type of income or accretion that can flow from property, the difficulty in fashioning any kind of reliable litmus test for judging whether and when the new property partakes the non-marital character of its prog[e]nitor becomes evident.

*Brodak v. Brodak,* 294 Md. 10, 447 A.2d 847 (1982), is also instructive. There, the husband acquired a trailer park from his parents as a gift. Later, he and his wife acquired three more trailers for use in the business. At the divorce trial, the court found the trailers constituted marital property. *Id.* at 26, 447 A.2d 847. On appeal, the husband contended that the three trailers were non-marital, because they were directly

traceable to the original gift from his parents. The Court of Appeals concluded that the property was properly considered a marital asset. *Id.* at 27, 447 A.2d 847. It reasoned that the income from the trailer park that was used to purchase the three trailers was partly generated by the efforts of the wife, who worked at the trailer park.

The case of *McNaughton v. McNaughton*, 74 Md.App. 490, 538 A.2d 1193 (1988), is also helpful to our analysis. In that case, the trial court considered whether appreciation in value of non-marital stock in a family business constituted marital property. *Id.* at 493, 538 A.2d 1193. The trial court found that the husband was well compensated, and he was " 'just one of many people whose work, along with a variety of other factors beyond the control of the [husband] and his family, contributed to the appreciation and increase in value of these business enterprises.' " *Id.* at 498, 538 A.2d 1193. Therefore, the trial court concluded that the increase in value of the stock in the close corporation did not constitute marital property, because the stock did not appreciate as a result of the husband's efforts.

We agreed. In reaching our conclusion, we noted that the husband's father identified many "employees whom he considered assets to the corporation and who worked for him on an average of 15 years," *id.* at 499, 538 A.2d 1193, and that much of the corporate growth was the result of external factors, such as "unprecedented inflation," the oil embargo, and the energy crisis. *Id.* at 499, 538 A.2d 1193. We also noted that "no evidence was presented from which the chancellor could form any basis, other than speculation, as to what portion, if any, of the increase in the initial non-marital shares was attributable to [the husband's] work as an officer and employee in the corporation." *Id.* at 501, 538 A.2d 1193. We went on to observe that the majority of the assets were purchased before the husband's "entrance onto the scene," and there were many "factors beyond his control," that led to the increase. *Id.* at 501, 538 A.2d 1193.

*Rosenberg v. Rosenberg,* 64 Md.App. 487, 527–31, 497 A.2d 485, *cert. denied,* 305 Md. 107, 501 A.2d 845 (1985), also provides guidance. In that case, the husband was a beneficiary of four trusts holding substantial amounts of stock in the American Trading and Petroleum Corporation ("ATAPCO"), a conglomerate. *Id.* at 528, 497 A.2d 485. ATAPCO's assets included four marine vessels, real estate, and stock in Standard Oil of Indiana and Crown Central Petroleum Corporation. *Id.* at 530, 497 A.2d 485. Although the value of ATAP-CO stock increased during the marriage, the trial court failed to find that the increased value was marital property. Because the wife failed to show that her husband's "personal efforts" had "either directly or indirectly contributed" to the increased value of his interests in ATAPCO, we upheld the trial court's determination that the appreciation constituted non-marital property. *Id.* at 530, 497 A.2d 485.

The case of *Schweizer v. Schweizer,* 55 Md.App. 373, 380, 462 A.2d 562 (1983), *aff'd in part,* 301 Md. 626, 484 A.2d 267 (1984), is also useful to our analysis. There, the wife challenged the trial court's determination that almost 25,000 shares of stock titled in her husband's name constituted non-marital assets. She claimed that the stock appreciated in value during the marriage because of her husband's management of the company, and therefore the increase in stock value constituted marital property. We rejected her argument, however, because we considered as "too tenuous and speculative" the extent to which the husband's efforts led to an increase in the value of stock acquired before the marriage. *Id.*

Unlike in *Schweizer,* we found in *Merriken v. Merriken,* 87 Md.App. 522, 539, 590 A.2d 566 (1991), that the evidence as to the husband's efforts was "not merely speculative." Indeed, the evidence demonstrated that the stock did not increase in value "by mere virtue of ... possession." *Merriken,* 87 Md.App. at 538, 590 A.2d 566. Rather, the husband's "active efforts" during the marriage led to the increase in value of property that he had inherited, and "transformed the character of a portion of those previously nonmarital properties into

partly marital property." *Id.* at 540, 590 A.2d 566. Moreover, we considered it significant that funds from the wife's full-time employment helped to support the family, and enabled the husband to reinvest nearly all of the funds generated by his business. *Id.* at 539–40, 590 A.2d 566. Therefore, we ruled that "the value of the accretion" constituted "marital property," *id.* at 541, 590 A.2d 566, and we remanded the matter to the trial court to determine which properties "actively increased" in value due to the husband's efforts, and to ascertain "the dollar value of those efforts...." *Id.* at 540, 590 A.2d 566. We also required the court to then determine the value of the accretion, as that represented the marital property. *Id.* at 541, 590 A.2d 566.

Applying the reasoning of the above-cited cases, we are satisfied that the record clearly supports the court's decision to treat all of TAMSCO's appreciation as marital; TAMSCO's value soared after the marriage, while the Husband was at the helm and shepherded TAMSCO's growth. Despite the Husband's assertion that the corporate success resulted from the efforts of others and from a variety of factors not related to his skills, such as "the expanding defense industry during the Reagan administration ...," the court, as fact-finder, was not compelled to accept appellant's version of events.

 Although the trial court attributed the entire appreciation to appellant's efforts, appellant only owned 51% of TAMSCO. Therefore, the court properly concluded that only 51% of that appreciation, corresponding to appellant's ownership interest, constituted marital property for purposes of a monetary award. After subtracting the premarital value of TAMSCO ($153,000.00), the court multiplied the value of TAMSCO by 51% to determine the value of appellant's ownership interest in the company. The court then allocated half of that value (i.e., ½ of 51% of the appreciation) to the Wife's monetary award. Certainly, the court was not required to divide the marital property evenly. *Ware,* 131 Md.App. at 223–24, 748 A.2d 1031; *see Deering v. Deering,* 292 Md. 115, 131, 437 A.2d 883 (1981). To the contrary, it is improper for a

trial court to "succumb[ ] to the temptation to divide the property equally." *Alston,* 331 Md. at 508, 629 A.2d 70. But, as the Court indicated in *Alston,* 331 Md. at 509, 629 A.2d 70, "[e]ach divorce situation is different, and must be evaluated individually."

 In this case, the court considered the statutory factors under F.L. § 8–205(b) in fashioning the monetary award. For example, the judge also found that appellant "was responsible for the estrangement of the parties by committing adultery during the marriage and later deserting [appellee]." In addition, the court considered that appellant had "spent large amounts of marital property during the separation on his life style and gambling." Moreover, the court was mindful that appellant had invested a substantial amount of marital funds in SeaMats and TRAMS, even though the court did not include these investments as marital property. Under the circumstances of this case, we perceive neither error nor abuse of discretion by the court in evenly dividing the marital portion of TAMSCO.

### B.

 Appellant contends that, in calculating the value of TAMSCO and appellant's interest in TAMSCO, the trial court erred by failing to consider TAMSCO's prospective tax liabilities, stemming from the company's disputes with the IRS concerning the company's Subchapter S status and its 401(k) Plan. In addition, the Husband complains that the court should have considered the potential tax consequences to him, if and when he sells his interest in TAMSCO. The trial court declined to consider any of the potential tax liabilities, believing that they were too speculative. We perceive no error.

Family Law § 8–205(b)(11) states that, in granting a monetary award, the court may consider "any other factor" it deems necessary to "arrive at a fair and equitable" award. In *Rosenberg, supra,* 64 Md.App. 487, 497 A.2d 485, we discussed that statutory provision with respect to the husband's complaint that, for purposes of the monetary award, the court

failed to consider his potential tax liability if he would have to sell his property to pay the award. We held that "potential income taxes do not alter the value of an asset for purposes of determining the value of either marital or non-marital property." *Id.* at 523, 497 A.2d 485. Moreover, we said that the husband's "future tax liabilities . . . and any gain on the future sale of assets" were too speculative for consideration. *Id.* at 526, 497 A.2d 485. We explained: "[V]alue means fair market value," *id.* at 525, 497 A.2d 485, and is the " 'estimated or appraised worth' of property . . ., not its appraised worth minus taxes." *Id.* at 525–26, 497 A.2d 485 (internal citations omitted); *see Gravenstine v. Gravenstine,* 58 Md.App. 158, 172–73, 472 A.2d 1001 (1984). Therefore, we determined that "taxes should not be taken into account in valuing property before making a monetary award." *Rosenberg,* 64 Md.App. at 526, 497 A.2d 485.

Under certain circumstances, however, we recognized that tax consequences may be an "other factor," pursuant to F.L. § 8–205(b)(11), which may be considered "in establishing the amount and method of payment of any monetary award." *Id.* at 523, 497 A.2d 485. When tax liability is " 'immediate and specific,' " it is appropriate for the court to consider it as an "other factor." *Rosenberg,* 64 Md.App. at 526, 497 A.2d 485; *see Quinn v. Quinn,* 83 Md.App. 460, 473, 575 A.2d 764 (1990) (stating that if the issue of tax consequences is "more than merely speculative," the court should consider them as an " 'other factor' "); *see also Williams v. Williams,* 71 Md.App. 22, 37, 523 A.2d 1025 (1987).

Here, we cannot say that the trial court erred in concluding that TAMSCO's tax liabilities were neither immediate, specific, nor quantifiable. To be sure, it was undisputed that TAMSCO was faced with the *possibility* of substantial tax liabilities arising from its disputes with the IRS concerning is Subchapter S status and the 401(k) Plan. At the time of trial, however, both matters were unresolved.

The Subchapter S matter was pending in federal tax court. Moreover, the March 15, 1996, and March 20, 1997, letters

written by appellant's tax attorney confidently predicted to TAMSCO's lenders that "no court" would rule against appellant and that TAMSCO would ultimately be successful in litigating this issue. A note in TAMSCO's Consolidated Financial Statements, prepared by its certified public accountants as of September 30, 1997, characterized the Subchapter S matter as an "uncertainty," indicated that the matter was "under appeal," and stated that TAMSCO intended "to pursue this matter in the courts to the maximum extent possible. . . ." Further, Land, appellee's expert in the valuation of businesses, deemed it inappropriate to consider TAMSCO's potential liability in valuing the company, and the court found his opinion more credible than Grossman's.

Lawrence Eisenberg testified for appellant as an expert in pension benefits. With respect to the 401(k) dispute, he estimated that TAMSCO could face anywhere between $2,000,000.00 in liabilities on the "high end," yet as little as $200,000.00 on the "low end." Moreover, he had notified TAMSCO's insurance carrier of the claim, apparently because the matter arose from the third party's administration of the plan. Although Grossman testified that the dispute regarding the 401(k) Plan had an impact on TAMSCO's value, Land disagreed.

With respect to appellant's personal tax exposure, his argument was predicated on a possible sale of his interest in TAMSCO. Yet, the Husband conceded that he had no plan to sell TAMSCO. As stated in *Rosenberg*, 64 Md.App. at 526, 497 A.2d 485, gains on future sales of property are too speculative to consider. Accordingly, the trial court did not err in determining that, for purposes of calculating a monetary award, appellant's personal tax liability was speculative and not appropriate for consideration.

## C.

We next consider appellant's contention that the trial court erred in calculating the value of his pre-marital interest in TAMSCO. In her written opinion, the trial judge said:

The Husband testified that at the time of the marriage, TAMSCO was worth between $300,000.00 and $500,000.00 and therefore, his 51% interest would be approximately $150,000.00 to $250,000.00.... [T]he Court finds that the company's value at the time of the marriage was approximately $300,000.00 and the Husband's interest would be worth approximately $153,000.00.

Appellant claims that the trial court mistakenly believed that appellant had testified that the pre-marital value of TAMSCO was at least $300,000.00. On that basis, the court determined that appellant's 51% interest amounted to $153,000.00. Appellant notes that he actually testified that his 51% interest in TAMSCO was worth at least $300,000.00 at the time of the parties' marriage. The following colloquy is relevant:

[APPELLANT'S COUNSEL]: Mr. Innerbichler, in your opinion, what was your interest in TAMSCO worth as of the date you divorced [your former wife]?

\* \* \*

[APPELLANT]: What did I think it was worth?

[APPELLANT'S COUNSEL]: Yeah.

[APPELLANT]: 3– or 400,000.

[APPELLANT'S COUNSEL]: Your interest?

[APPELLANT]: Yes.

[APPELLANT'S COUNSEL]: And at that time of your divorce to [your former wife], what amount of TAMSCO did you own?

[APPELLANT]: Fifty-one percent.

Further, appellant testified that, in connection with his divorce from Barbara, he waived his interest in their home, an asset supposedly worth about $272,000.00, in consideration for Barbara's agreement to waive her interest in TAMSCO. Thus, appellant claims that the trial court should have found the value of his premarital interest in TAMSCO was worth at

least $300,000.00, because his testimony in this regard was not controverted.

Not surprisingly, appellee asserts that TAMSCO had virtually no value when the parties married. Therefore, she contends that the court's error, if any, is of no consequence.

Valuation is not an exact science. *Brodak, supra,* 294 Md. at 27, 447 A.2d 847. In determining the pre-marital value of appellant's interest in TAMSCO, the court was not required to accept the parties' testimony. *Williams,* 71 Md.App. at 36, 523 A.2d 1025. Moreover, in arriving at the pre-marital value, the court did not rely only on appellant's testimony; it also considered the relevant corporate tax returns, which reflected a net income of $60,000.00, as well as the Army contract of $1.3 million.

Nevertheless, it is clear from the trial judge's opinion that her ruling was largely based on her belief that appellant had said that TAMSCO itself was worth between $300,000.00 and $500,000.00 at the time of his marriage to appellee. After accepting that TAMSCO was worth $300,000.00 at the time of the marriage, a simple mathematical calculation then resulted in the court's determination that appellant's 51% pre-marital interest was worth $153,000.00. As we noted, however, the judge was mistaken in her recollection, because appellant testified that *his interest,* not TAMSCO itself, was worth between $300,000.00 and $400,000.00. Therefore, we conclude that the judge erred in determining the pre-marital value of TAMSCO to the extent that she erroneously recalled that appellant said that TAMSCO was worth $300,000.00 at the time of his marriage to appellee. Accordingly, we shall remand for further proceedings, so that court may reconsider its ruling.

Upon remand, the court may ultimately conclude that, indeed, TAMSCO itself was only worth $300,000.00 at the time of the parties' marriage. If the court reaches that conclusion, however, it should not rely on appellant's testimony to that effect, because appellant did not so testify. Moreover, if, on remand, the court alters its conclusion as to the value of the

Husband's pre-marital interest in TAMSCO, it must necessarily adjust its calculation of the monetary award, which was based on the marital property value of TAMSCO.

### D.

■ Appellant complains that the trial court erred in the manner in which it required him to pay the monetary award. The schedule required appellant to make payments over five years, without interest, as follows:

 (a) $430,310.79 to be paid by July 27, 1999;

 (b) $215,155.39 to be paid by January 27, 2000;

 (c) $215,155.40 to be paid by July 27, 2000;

 (d) $215,155.39 to be paid by January 27, 2001;

 (e) $215,155.40 to be paid by July 27, 2001;

 (f) $215,155.39 to be paid by January 27, 2002;

 (g) $215,155.40 to be paid by July 27, 2002;

 (h) $215,155.39 to be paid by January 27, 2003;

 (i) $215,155.40 to be paid by July 27, 2003;

 (j) $215,155.39 to be paid by January 27, 2004;

 (k) $215,155.40 to be paid by July 27, 2004.

Moreover, the court ruled that, if appellant did not pay in accordance with the above schedule, "a judgment will be entered against the [Husband], in favor of the [Wife] with interest accruing at the legal rate."

Appellant contends that, due to the combined amount of monthly child support ($3276.00) and alimony that he is obligated to pay, the court's schedule "creates a harsh and inequitable result...." He complains that "he literally does not have the ability to pay the monetary award in the manner required by the court."

■ We perceive no abuse of discretion. It is well established that the method of payment of a monetary award is committed to the sound discretion of the trial court. *Deering v. Deering, supra,* 292 Md. at 131, 437 A.2d 883; *Caccamise v. Caccamise,* 130 Md.App. 505, 522–23, 747 A.2d 221

(2000). In *Doser,* 106 Md.App. at 351, 664 A.2d 453, we recognized that, when a monetary award is made, the court "may order a party to pay a fixed sum of cash ... [or] it may establish a schedule for future payments of all or part of the award...." To be sure, the "terms of the payment must be fair and equitable," *Caccamise,* 130 Md.App. at 523, 747 A.2d 221, and the court should consider the method of payment in light of the payor's ability to pay. *Rosenberg, supra,* 64 Md.App. at 523, 497 A.2d 485. Under the circumstances of this case, the five-year, interest-free schedule was eminently reasonable.

The trial court found that appellant's net worth exceeded $8 million, and his annual salary and automobile allowance amounted to $675,000.00. The court was obviously mindful that appellant enjoys "an extremely high income from TAM-SCO," and continues to live an "exorbitant life-style." Indeed, in the three years prior to trial, appellant had received over $7 million from TAMSCO's profits, and he had invested almost $2.5 million of that sum in two business ventures. Although the court did not treat those two substantial investments as marital property for purposes of calculating the monetary award, the court was not required to ignore that appellant had used the money for his benefit; the future profits, if any, would inure to him; and he still had almost $3 million of that sum at his disposal. The court was also aware that, in the same three year period, appellant had only paid a total of "$480,773.00 for support of the Wife and child and [home] improvements," leaving him with "$840,000.00 per year *after taxes* to spend on himself...."

Thus, although it was undisputed that TAMSCO's revenues were expected to decline somewhat in the future, and appellant had a sizeable obligation as to the monetary award, alimony, and child support, the trial court's order was not "so harsh as to force a wage earner spouse to liquidate his or her ... interest in order to satisfy" the monetary award. *Deering,* 292 Md. at 131, 437 A.2d 883.

## E.

Appellant contends that the trial court erred in awarding rehabilitative monthly alimony of $8,000.00 for five years, followed thereafter by $6,000.00 per month in indefinite alimony. He asserts that, in rendering its decision as to alimony, the court failed to consider the sizeable monetary award to the Wife. He also complains that the parties separated after just eleven years of marriage, and the fourteen-year marriage was of "short duration," by objective standards. Moreover, he complains that appellee's financial statement was replete with inaccuracies and overstated her legitimate expenses.

Maryland's statutory scheme favors fixed-term, "rehabilitative" alimony rather than indefinite alimony. *See Blaine v. Blaine*, 336 Md. 49, 68, 646 A.2d 413 (1994); *Turrisi v. Sanzaro*, 308 Md. 515, 527, 520 A.2d 1080 (1987); *Roginsky v. Blake–Roginsky*, 129 Md.App. 132, 142, 740 A.2d 125 (1999). "The goal is to render the party seeking alimony self-supporting so as to vitiate any further need for alimony." *Hull v. Hull*, 83 Md.App. 218, 223, 574 A.2d 20, *cert. denied*, 321 Md. 67, 580 A.2d 1077 (1990); *see Jensen v. Jensen*, 103 Md.App. 678, 692, 654 A.2d 914 (1995). In *Tracey v. Tracey*, 328 Md. 380, 614 A.2d 590 (1992), the Court explained:

[T]he purpose of alimony is not to provide a lifetime pension, but where practicable to ease the transition for the parties from the joint married state to their new status as single people living apart and independently. Expressed otherwise, alimony's purpose is "to provide an opportunity for the recipient spouse to become self-supporting." The concept of alimony as life-long support enabling the dependent spouse to maintain an accustomed standard of living has largely been superseded by the view that the dependent spouse should be required to become self-supporting, even though that might result in a reduced standard of living.

*Id.* at 391, 614 A.2d 590 (citations omitted); *see also Rock v. Rock*, 86 Md.App. 598, 608, 587 A.2d 1133 (1991); *Blake v. Blake*, 81 Md.App. 712, 727, 569 A.2d 724 (1990); *Rogers v. Rogers*, 80 Md.App. 575, 591, 565 A.2d 361 (1989); *Thomasian*

*v. Thomasian,* 79 Md.App. 188, 194–95, 556 A.2d 675 (1989); *Campolattaro v. Campolattaro,* 66 Md.App. 68, 75, 502 A.2d 1068 (1986); *Holston v. Holston,* 58 Md.App. 308, 321, 473 A.2d 459, *cert. denied,* 300 Md. 484, 479 A.2d 372 (1984).

In making an award of alimony, the trial court must consider the factors set forth in F.L. § 11–106(b); *see Doser, supra,* 106 Md.App. at 355–56, 664 A.2d 453. The factors are as follows:

(1) the ability of the party seeking alimony to be wholly or partly self-supporting;

(2) the time necessary for the party seeking alimony to gain sufficient education or training to enable that party to find suitable employment;

(3) the standard of living that the parties established during their marriage;

(4) the duration of the marriage;

(5) the contributions, monetary and nonmonetary, of each party to the well-being of the family;

(6) the circumstances that contributed to the estrangement of the parties;

(7) the age of each party;

(8) the physical and mental condition of each party;

(9) the ability of the party from whom alimony is sought to meet that party's needs while meeting the needs of the party seeking alimony;

(10) any agreement between the parties;

(11) the financial needs and financial resources of each party, including:

(i) all income and assets, including property that does not produce income;

(ii) any award made under §§ 8–205 and 8–208 of this article;

(iii) the nature and amount of the financial obligations of each party; and

(iv) the right of each party to receive retirement benefits; and

(12) whether the award would cause a spouse who is a resident of a related institution as defined in § 19–301 of the Health–General Article and from whom alimony is sought to become eligible for medical assistance earlier than would otherwise occur.

The Legislature has recognized, however, that rehabilitative alimony may not always be appropriate. F.L. § 11–106(c) authorizes the trial court to award indefinite alimony to ensure "an appropriate degree of spousal support ... after the dissolution of a marriage." *Tracey*, 328 Md. at 388, 614 A.2d 590. F.L. § 11–106(c) states:

(c) *Award for indefinite period.*—The court may award alimony for an indefinite period, if the court finds that:

(1) due to age, illness, infirmity, or disability, the party seeking alimony cannot reasonably be expected to make substantial progress toward becoming self-supporting; or

(2) even after the party seeking alimony will have made as much progress toward becoming self-supporting as can reasonably be expected, the respective standards of living of the parties will be unconscionably disparate.

A trial court has broad discretion in awarding alimony, which may include both rehabilitative and indefinite components. *See Coviello v. Coviello*, 91 Md.App. 638, 652, 605 A.2d 661 (1992). When reviewing a lower court's award of alimony, an appellate court defers to the findings and judgments of the trial court, acting in their equitable capacity, and will not disturb such judgments "unless it concludes that 'the trial court abused its discretion or rendered a judgment that is clearly wrong.' " *Digges v. Digges*, 126 Md.App. 361, 386, 730 A.2d 202, *cert. denied*, 356 Md. 17, 736 A.2d 1065 (1999) (citation omitted); *see Blaine*, 336 Md. at 74, 646 A.2d 413; *Tracey*, 328 Md. at 385, 614 A.2d 590; *Crabill v. Crabill*, 119 Md.App. 249, 260, 704 A.2d 532 (1998). Moreover, a trial court's determination of unconscionable disparity under F.L. § 11–106(c) is a question of fact. Therefore, we review that finding under the clearly erroneous standard set forth in Md.

Rule 8–131(c). *Ware,* 131 Md.App. at 228, 748 A.2d 1031; *Roginsky,* 129 Md.App. at 143, 740 A.2d 125.

Appellant seemingly overlooks that appellee lacked a college education and earned only $26,000.00 per year as a secretary before working at TAMSCO. Moreover, although appellee earned $65,000.00 per year while she worked for TAMSCO, she maintained that she was not actually qualified for that position. Appellee also testified that she intended to pursue a career as a pre-school teacher. Her vocational expert opined that appellee would likely earn $26,000.00 per year after obtaining a college degree, an endeavor estimated to take at least five years. In contrast, appellant was earning over $650,000.00 per year in salary at the time of trial, and received substantial additional funds from TAMSCO's profits.

■ A court may award indefinite alimony as well as a sizeable monetary award. *Ware,* 131 Md.App. at 239, 748 A.2d 1031. In its opinion, the trial court meticulously reviewed the applicable statutory factors governing alimony, expressly considered its significant monetary award, and evaluated the parties' needs and their respective economic positions. The court found, *inter alia,* that the case presented an unconscionable economic disparity. Appellee could expect to earn approximately $26,000.00 annually, even "after receiving appropriate education," amounting to a small fraction of appellant's income. Appellee had never earned more than $65,-000.00. Even if the court imputed $65,000.00 of income to appellee, her income would still be less than 10% of appellant's. Further, the court recognized that the parties had enjoyed an "opulent lifestyle," that both parties contributed to the well being of the family, that appellee suffered from depression, she would be unemployed after the divorce, was incurring educational expenses to obtain a college degree, and had no other source of support. Thus, the court said:

Under the circumstances of this case, the Court finds it is appropriate to grant indefinite alimony. The Court concludes that the disparity in income would be unconscionable

even if the Wife makes as much progress at becoming self-supporting as can be reasonably expected.

(Internal citations omitted).

As Judge Moylan recently noted for this Court in *Ware*, unconscionable economic disparity is more than a numerical calculation. *Ware*, 131 Md.App. at 229, 748 A.2d 1031. Therefore, the court cannot "ignore totally the aggravating characteristic of unconscionability." *Id.* Moreover, economic "self-sufficiency per se does not bar an award of indefinite alimony if there nonetheless exists an unconscionable economic disparity in the parties' standards of living after divorce." *Tracey*, 328 Md. at 392–93, 614 A.2d 590. The determination of unconscionable disparity "requires the application of equitable considerations on a case-by-case basis, consistent with the trial court's broad discretion in determining an appropriate award." *Roginsky*, 129 Md.App. at 146–47, 740 A.2d 125 (quoting *Blaine*, 336 Md. at 71–72, 646 A.2d 413). In this case, it is readily apparent that the court's decision was not based simply on a mathematical computation. Rather, the court made a careful analysis of the various equitable considerations.

What we said in *Crabill v. Crabill*, 119 Md.App. 249, 266, 704 A.2d 532 (1998), is apt here:

There is no bright line for determining the propriety of an alimony award. The Court of Appeals consistently has declined to adopt "a hard and fast rule regarding any disparity" in income for purposes of awarding indefinite alimony. Each case depends upon its own circumstances "to ensure that equity be accomplished." We note, however, that gross disparities in income levels frequently have been found unconscionable, and have supported the award of indefinite alimony.

(Internal citations omitted).

Based on the foregoing, we are satisfied that the court did not err or abuse its discretion by awarding indefinite alimony as well as a significant monetary award. The monetary award represents appellee's share of the marital proper-

ty, and is to be paid by appellant over a period of five years. The court clearly considered each award in light of the other, *see Williams v. Williams,* 71 Md.App. 22, 37, 523 A.2d 1025 (1987), and in light of the particular circumstances of this case. As we see it, the judge properly "fashion[ed] the total relief package which she deemed to be equitable ... by combining the two relief modalities...." *Ware,* 131 Md.App. at 239, 748 A.2d 1031.

**COURT'S FINDING VACATED AS TO PRE–MARITAL VALUE OF APPELLANT'S INTEREST IN TAMSCO; CASE REMANDED TO THE CIRCUIT COURT FOR PRINCE GEORGE'S COUNTY FOR FURTHER PRO-CEEDINGS CONSISTENT WITH THIS OPINION; JUDG-MENT AS TO MONETARY AWARD TO ABIDE THE REMAND; JUDGMENT AFFIRMED IN ALL OTHER RESPECTS. COSTS TO BE PAID 80% BY APPELLANT AND 20% BY APPELLEE.**